**Charles ALBANESE, Petitioner,**

v.

**Kenneth McGINNIS, Director of the Illinois Department of Corrections; and James Greer, Warden, Menard Correctional Center, Respondents.**

**No. 90 C 1556.**

United States District Court,
N.D. Illinois, E.D.

May 28, 1993.

J. Steven Beckett, Beckett, Crewell & Kelso, P.C., Urbana, IL, for plaintiff.

Terence Madsen, Illinois Atty. General's Office, Chicago, IL, for defendants.

Bruce H. Bornstein, Alan Michael Freedman, Freedman & Bornstein, Chicago, IL, for Andrew Kokoraleis, amicus.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Petitioner Charles Albanese was convicted in separate trials of the murders of his father, mother-in-law, grandmother-in-law, and the attempted murder of his brother. He was sentenced to death in both proceedings. Albanese seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 ("§ 2254") and asks this court to review the constitutionality of his convictions and sentences. For the reasons stated below, the Petition for Writ of Habeas Corpus is denied.

## PROCEDURAL HISTORY

In May 1982 Petitioner Albanese was convicted of the murders of Mary Lambert, his wife's grandmother, and M.J. Albanese, his father, as well as the attempted murder of his brother Michael Albanese, all by arsenic poisoning.[1] At the request of Albanese, the May 1982 trial was transferred from McHenry County, where the indictment was outstanding, to McLean County. The McLean County jury sentenced Albanese to death.[2] On direct appeal, the Illinois Supreme Court affirmed the conviction and sentence, *People v. Albanese*, 102 Ill.2d 54, 79 Ill.Dec. 608, 464 N.E.2d 206 (1984) (hereinafter *"Albanese I "*). The United States Supreme Court denied *certiorari*, *Albanese v. Illinois*, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 205 (1984).

In October 1982 Albanese was convicted in Lake County of the murder of his mother-in-law, Marion Mueller. Petitioner waived a jury for sentencing, and the trial judge imposed the death sentence. The Illinois Supreme Court affirmed the conviction and sentence on direct appeal, *People v. Albanese*, 104 Ill.2d 504, 85 Ill.Dec. 441, 473 N.E.2d 1246 (1984) (hereinafter *"Albanese II "*), and *certiorari* was denied, *Albanese v. Illinois*, 471 U.S. 1044, 105 S.Ct. 2061, 85 L.Ed.2d 335 (1985).

Albanese filed separate post conviction petitions attacking the constitutional validity of his convictions and death sentences in McHenry and Lake Counties. The McHenry County petition was denied after a three-day evidentiary hearing held in May 1986. The Lake County petition was denied without a hearing. Both denials were appealed directly to the Illinois Supreme Court, which affirmed the denial of post conviction relief after·consolidating the appeals due to the similarity of issues presented. *People v. Albanese*, 125 Ill.2d 100, 125 Ill.Dec. 838, 531 N.E.2d 17 (1988) (hereinafter *"Albanese III "*). Once again, *certiorari* was denied, *Albanese v. Illinois*, 490 U.S. 1075, 109 S.Ct. 2088, 104 L.Ed.2d 652 (1989). Petitioner now seeks federal habeas relief from the McHenry and Lake County convictions and sentences.[3] Respondents (hereinafter re-

---

1. In addition, Albanese was convicted of two counts of theft; he does not challenge those convictions or sentences.

2. This trial will be referred to throughout as the "McHenry trial."

3. In response to this court's inquiry regarding whether, under Rule 2(d) of the Rules Governing Section 2254 Cases in the United States District Courts, Petitioner could challenge the McHenry and Lake County convictions and sentences by way of a single petition for habeas corpus, both parties agreed that a single petition was proper

ferred to as the "State") concede that Albanese has exhausted his state remedies and have moved that the court deny the Petition.

## BACKGROUND

Under § 2254(d) factual findings by a state court "are presumed to be proper in a federal habeas corpus proceeding, if the findings are made after a hearing on the merits, and they are fairly supported by the record." *Wilson v. McCaughtry*, 994 F.2d 1228, 1230 (7th Cir.1993). Factual findings made by a state appellate court are accorded the same statutory presumption of correctness as findings made by a state trial court. *Lewis v. Huch*, 964 F.2d 670, 671 (7th Cir.1992).

### 1. Trial Evidence.

The following facts are taken from the Illinois Supreme Court's opinion in *Albanese I* (McHenry County). Additional facts from this court's review of the trial transcripts have been added in brackets ({ }).

In 1980, Charles Albanese was president of Allied Die Casting Corporation, a family business that manufactured trophies and loving cups. Albanese was married and lived in a large home in Spring Grove with his third wife and two daughters. Albanese had three other daughters by his first wife, and they were living in Wisconsin with their mother. Albanese maintained what can be termed a comfortable life style; he had a swimming pool, two Cadillacs leased by Allied Die Casting Corporation for the family's use, and he took frequent vacations to tropical destinations. Albanese testified that he spent everything that he earned and was not able to live on $110,000 per year "and do some of the things I want."

Charles Albanese began experiencing serious economic problems in July of 1980. He was behind in his mortgage payment and six months' delinquent in child-support payments to his first wife. He also owed a $15,000 note at the State Bank of Richmond, due on August 14, 1980. In July of 1980, his ex-wife's lawyer filed a petition requiring him to appear in court on a rule

to show cause, and a body attachment was issued when he failed to appear.

On August 3, Marion Mueller, [Albanese's] mother-in-law, and Mary Lambert, Mrs. Albanese's grandmother, came to the Albanese home for Sunday dinner. Mueller and Lambert lived together in a condominium at Leisure Village, a retirement complex in Fox Lake, and often visited the Albanese home for Sunday dinner. The family ate Polish sausage and sauerkraut family style from the same platter, so it appears the arsenic was ingested from another source. Charles Albanese testified that, to his knowledge, the two guests had nothing to drink. Charles Albanese insisted this was the case even though the 87-year-old Mary Lambert was working in the yard on a hot day for several hours prior to eating dinner.

On August 4, 1980, Charles Albanese sent his ex-wife's lawyer a postdated check for $3,648, the amount of the child-support arrearages, along with a note that informed the attorney that the check was dated August 15 because a deposit would be made to his account around August 13. Charles also sent him a postdated check for $500. On August 5, 1980, Mary Lambert was admitted to the emergency room at McHenry Hospital with a history of vomiting and diarrhea for the preceding 36 to 48 hours. On August 6, 1980, Mrs. Lambert died leaving Marion Mueller and Virginia Albanese as her heirs. Charles Albanese's wife, Virginia Albanese, closed out her grandmother's checking account and transferred $3,600 to the joint-tenancy account she shared with her husband. This amount helped to cover the postdated check for Charles Albanese's child-support payments.

Charles Albanese was arrested for his child-support arrearage on August 8, 1980, while on the way to Mary Lambert's funeral. He was released when it was made clear that he would pay the delinquent child support. Marion Mueller experienced vomiting and diarrhea shortly after

and the most convenient way to proceed. (Brief of Petitioner Oct. 27, 1992, at pp. 1–9; State's

Response Nov. 2, 1992, at 1).

the August 3, 1980, meal at the Albanese home, and she was hospitalized at St. Therese's Hospital in Waukegan on August 16, 1980. Her condition deteriorated and she died on August 18, 1980. On August 20, 1980, money held in a joint-tenancy account with Virginia Albanese and Marion Mueller was transferred to the joint-tenancy account of Charles Albanese and Virginia Albanese.

The body of Marion Mueller was exhumed on August 31, 1981, and the body of Mary Lambert was exhumed on August 13, 1981. The official cause of death for both women was acute gastroenteritis due to arsenic poisoning. Mary Lambert had approximately eight times the normal amount of arsenic in her body and Marion Mueller had five times the normal concentration of arsenic. Forensic chemist Joerg Pirl testified that the two women died of a massive dose of arsenic.

Virginia Albanese received $6,000 in life insurance proceeds and pension fund proceeds from Marion Mueller's death, and the money was used to make the delinquent payments on the Albaneses' mortgage. The State Bank of Richmond granted Charles Albanese two extensions on the note due August 14, 1980, because Charles Albanese told the bank that he had some real estate that he was trying to sell. Charles and Virginia Albanese sold the Leisure Village condominium owned by the two dead women for $50,000 in October of 1980. Virginia Albanese inherited the condominium by intestate succession. Twenty thousand dollars from this sale was deposited in the joint account of Charles and Virginia Albanese, and this amount was used to satisfy the $15,000 note due at the Richmond State Bank.

In 1980, Allied Die Casting was owned by three stockholders: Charles Albanese, M.J. Albanese (Charles' father), and Michael Albanese (Charles' brother). The three men made up the board of directors and each held an executive office. Charles Albanese was president of the corporation, Michael Albanese was vice-president, and M.J. Albanese held the office of secretary-treasurer. The shareholder agreement, approved by the board of directors, gave special powers to M.J. Albanese. He had absolute power to control and manage the company, including the power to veto or negate the decision of any other officer or employee. This arrangement was consistent with the origins of Allied Die Casting. M.J. Albanese was the moving force behind the business, and Charles had joined the family business when a previous job had not worked out. Charles Albanese did not have a good relationship with his brother, Michael Albanese, but conflicting testimony was offered concerning the relationship between Charles Albanese and M.J. Albanese.

A. Donald Fishbein, attorney for Allied Die Casting, testified that he attended a corporate meeting on September 4, 1980. Fishbein, Michael Albanese, Charles Albanese, M.J. Albanese, and M.J.'s wife, Clara Albanese, were in attendance. Fishbein testified that the purpose of the meeting was to terminate the employment of Charles Albanese. Charles Albanese disputed this claim when he testified in his own behalf at trial. After the meeting, the board of directors executed an amendment to the shareholder's agreement that caused the demotion of Charles Albanese. M.J. Albanese was made president, Michael Albanese was made secretary and vice president, and Charles Albanese was made treasurer. Clara Albanese was to become a stockholder, having equal ownership with the three men.

On September 8, 1980, Michael Albanese ate his lunch at work. He had left his sandwich in his office prior to lunch. Michael began vomiting about an hour after eating lunch, and was hospitalized later that day. He left the hospital on September 13, 1980. On November 14, 1980, Michael Albanese experienced another attack of vomiting and diarrhea about two hours after eating lunch at work, and again sought medical attention. He was not hospitalized, but was placed on a bland diet in order to alleviate the symptoms of an ulcer that was detected by the treating physician, Dr. Miller. Michael Albanese's wife began preparing lunches for Michael to take to work in order to conform with the

bland diet recommended by Dr. Miller. Michael testified that his periods of illness usually began after he had eaten or had coffee at work.

On February 21, 1981, Michael Albanese's wife heated a can of pea soup and placed it in a thermos for her husband to take to work. Michael Albanese left the thermos in his office when he left to keep an appointment with Dr. Miller. He returned around lunch time after Dr. Miller had told him that his ulcer was under control and that he could discontinue the bland diet. Michael began eating his soup while M.J. Albanese was talking to him. Charles Albanese urged his father to leave Michael alone until he had finished eating. Michael testified that he only ate about half of the soup because it "tasted funny." He went into the computer room and began working. After a short time, he began vomiting and became so ill that he left the office. He had to stop his car on the side of the road in order to vomit before he reached home. He went to bed but was plagued by vomiting and diarrhea until the next morning when he called Dr. Miller. Outpatient tests were performed that day, and Dr. Miller ordered immediate hospitalization.

Although Michael was discharged from the hospital on March 13, 1981, his condition was still very serious. In addition to the gastrointestinal difficulties, Michael began experiencing numbness in his hands and feet, and the nerve damage became so severe he was unable to walk, dress himself, or carry on normal business activities. He was in intense pain and had difficulty sleeping at night. His wife had rinsed out the thermos, but police tests revealed the presence {but did not determine the quantity}[4] of arsenic in the thermos.

Medical tests revealed that Michael Albanese was not suffering from an ulcer, but that he had received sublethal doses of arsenic over a period of months, and that this poisoning was the cause of his nerve damage. Michael's condition improved slowly, and he was finally able to return to

work and walk with the aid of leg braces. At the time of [McHenry] trial, in May 1982, he still had difficulty with his hands, and the residual numbness was so severe he was unable to perform many simple tasks such as buttoning his shirt.

M.J. Albanese kept a cookie jar in his credenza at work, and often ate cookies while he worked at his desk. In March of 1981, M.J. began vomiting and experiencing severe diarrhea. The symptoms were so similar to Michael's that Dr. Miller suspected that M.J. was having psychological problems caused by the serious illness of his son. On April 21, 1981, M.J. Albanese was so ill he was taken to the emergency room and hospitalized. He was released after a few days, but his condition did not improve. M.J. complained of numbness in his hands and feet, and was referred to a neurologist for tests which demonstrated some sensory nerve deficit.

M.J. was hospitalized for the last time on May 9, 1981. He complained of vomiting, pain, and increasing numbness in his hands and feet, and his condition gradually deteriorated. Charles Albanese visited M.J. frequently. Dr. Miller testified that "[t]he one I remember most being there, almost hovering every day, was Charles." M.J. had skim milk at his bedside in order to alleviate the dehydration caused by the severe vomiting and diarrhea.

On May 15, 1981, Charles Albanese called Mr. Fishbein at home in the early morning hours. He told Fishbein that the doctors did not expect M.J. to live very long, and that he should prepare an amendment to the Allied Die Casting Corporation agreement as soon as possible, and get to the hospital. Dr. Miller testified that he was mystified by M.J.'s deterioration and certainly did not expect M.J. to die soon. Charles and Michael Albanese visited M.J. at the hospital that day, and the three men signed an amendment to the shareholder agreement. This agreement promoted Charles to vice-president of Allied Die Casting Corporation. M.J. was in intense pain and strapped to the hospital

---

4. The thermos was tested for the presence of arsenic by the Northern Illinois State Crime Laboratory. (McHenry Record vol. XXXIII at 75, 90–92).

bed. Michael was in a wheelchair, and he was so crippled he needed his wife's assistance to sign the agreement. M.J. Albanese died in the early morning hours of May 16, 1981. Joerg Pirl, forensic chemist, examined samples of M.J.'s hair and fingernails, and concluded that death was caused by arsenic poisoning, with sublethal doses administered over a four-month period, and a large lethal dose administered immediately prior to death.

Defense counsel theorized that M.J. might have received arsenic poisoning from an octopus meal consumed shortly before entering the hospital. The package of octopus was retrieved, and laboratory tests revealed the arsenic in the octopus was within normal, nonlethal levels. Arsenic is a compound that is found as a trace element in many food items and in every person.

Laboratory tests revealed the presence {but did not determine the quantity}[5] of arsenic in the crumbs remaining in M.J.'s cookie jar. Charles Albanese testified that he often ate cookies out of M.J.'s cookie jar, and that he continued to do so after M.J.'s death. Charles was not able to explain how he had escaped the arsenic that had killed his father, nor was he able to satisfactorily explain why the cookie jar was left in his father's credenza. Charles explained that he continued to walk to his father's office every time he wanted a cookie, instead of moving the jar into his own office. Charles claimed there was no room in his office for a cookie jar. [...]

With M.J. dead, and Michael crippled and at home, Charles Albanese was in sole control of Allied Die Casting Corporation. His financial situation was still very serious and he began selling scrap metal and zinc, property of the corporation, to J.W. Reichel and Sons and to Clearing Smelting Corporation. Charles sold 88,000 pounds of zinc and $9,300 worth of scrap metal in these transactions. Charles insisted that the checks be made out to him personally or to cash, and he would not accept checks made out to Allied Die Casting Corporation. Charles received nearly $40,000 for these transactions. In November of 1981, when police began investigating the mysterious deaths in the Albanese family and visiting Allied Die Casting Corporation, Charles called Edward Cohen at Clearing Smelting and told him, "If anybody calls regarding any of our transactions, you know nothing of it."

Police investigators were unable to discover the presence of arsenic in hair and fingernail samples of {Charles Albanese, or}[6] employees at Allied Die Casting, or the presence of the poison at the Leisure Village complex. Charles Albanese was arrested in November 1981, shortly before he was to leave for a holiday in Jamaica with his wife and mother. Charles has not contested the theft charges stemming from the sale of the company scrap metal and zinc. [...]

At trial, Joe Reichel, vice-president of J.W. Reichel and Sons in Elkhorn, Wisconsin testified that he talked with Charles Albanese in the autumn of 1979. Reichel testified that Charles told him he needed something to "get rid" of "some pests around the house." Reichel's company had a small quantity of arsenic which was used for a plating process. Reichel brought Charles a small tupperware container of arsenic a few weeks after the conversation. Charles requested more arsenic about two weeks later, and Reichel brought Charles a small baby food jar containing arsenic. {Charles initially denied to McHenry police that he had ever possessed arsenic.}[7]

Charles Albanese testified that he needed the arsenic because he had recurrent problems with pests around the house. He testified that he put the arsenic out at night near the garbage container because pests had been getting in there at night, and he found garbage strewn all over his lawn. Charles did not adequately explain why he would put a lethal poison where

---

5. (McHenry R. vol. XXXIII at 93–94).

6. (McHenry R. vol. XXXIII at 96–97).

7. *Albanese II* (Lake County), 85 Ill.Dec. at 445, 473 N.E.2d at 1250; Lake Record vol. 10 at 1403.

household pets and neighborhood children could reach it, rather than obtaining garbage cans with lids instead of the uncovered containers he used as receptacles.

One of Albanese's neighbors, Pat Marshall, testified at trial. She stated that there had been problems with pests in the area, but that the problems did not begin until the spring of 1980. Both Pat Marshall and Virginia Albanese testified that the Albanese's garbage was strewn all over the lawn in the spring of 1980. Thus, Charles Albanese obtained the arsenic at least four months before the garbage and pest problem described by other witnesses.

Charles testified at trial that he did not poison anyone. He accused his brother Michael of poisoning M.J. Charles further testified that Michael poisoned himself so it would appear that Charles was the criminal. Charles was not able to explain how Michael could have administered the fatal dose to M.J. on May 15, 1981, when Michael was so crippled he could barely hold a pen in his hand.

Charles testified that Michael was the architect of the clandestine sale of zinc and scrap metal. Charles stated that he paid Michael cash because his brother was so crippled he could not sign checks. Charles was unable to explain how his brother signed his paychecks during the period of his most severe paralysis.

Charles denied being present at Allied Die Casting on September 8, 1980, shortly after he was demoted, and the day Michael had his first attack of vomiting. Charles was presented with a series of checks and order forms that he had signed on September 8, 1980, but he explained that he must have put the wrong date on all of the documents and signed them on a different day. {Charles also denied being at work on January 6, 1981, a day when Michael became ill with vomiting. Charles testified that a check and telephone order dated January 6, 1981 and signed by him must have been completed on a different day.} [8] Charles could not establish that Michael had seen Mary Lambert and Marion Mueller shortly before their deaths. He con-

ceded that Michael had not profited from the deaths of the two women. When asked who had profited, Charles said, "I did, my wife did."

While Charles was an inmate at McHenry County jail awaiting trial, he made the acquaintance of another inmate, Marty Nathan. Nathan testified that Charles asked him " * * * if I knew anybody that would take care of some people for him * * * and then he said like about some money for like $10,000 on a first payment and like 10 or 20 on a second one. And I took it and—you know, thinking that he meant to have them killed." Nathan testified that Charles wanted to have his brother Michael and Joe Reichel, the man who supplied Charles with arsenic, killed while he was in jail. Nathan did not receive any money from Charles, but Nathan agreed to mail some letters for Charles when he was discharged from prison.

At trial, Charles admitted that he wrote a letter in prison that attempted to implicate Michael in the poisoning deaths and that he had Marty Nathan mail copies of the letter to his mother, his wife, the plant supervisor at Allied Die Casting, and his uncle, Frank Albanese. The letter was admitted into evidence, and stated:

> Joe Reichel and Charles' brother, Mike, he used me to kill those people and set up Charles. The containers Joe gave Charles had powdered sugar with a little arsenic, just enough to get rid of the animals.

> Michael almost took too much by trying to make himself look like a victim. The police followed the clues just as we set them up. Mike set up the phony theft. Now they tried to double cross me. That was their first and last mistake they ever made.

*Albanese I,* 79 Ill.Dec. at 610–15, 464 N.E.2d at 208–13.

The evidence presented in the Lake County trial was substantially similar to that set out above, except that no evidence regarding the murder of M.J. Albanese, the attempted murder of Michael Albanese, or the charges

8. (McHenry R. vol. XXXIII at 172, 176–77).

of theft was admitted. Charles Albanese did not testify in the guilt phase of the Lake County trial. The main new evidence presented in the Lake County trial was testimony by another of Charles' cellmates, John Saltz. According to Saltz, Charles hatched a scheme whereby he would give Saltz a "suicide note," written as though by Michael Albanese, Saltz would go to Michael Albanese's home, force Michael to copy and sign the note, and then Saltz would murder Michael and his wife, Gayle, by shooting them. The note, as copied by Saltz from Charles' instructions, read as follows:

> We can no longer live with what we have done. We with the help of another killed the old ladies. I took arsenic myself to make Chuck look guilty but I over did it and now I'll never be the same. The sale of the zinc and scrap was actually my idea but I had him do it in a way that I could make mom [sic] believe Chuck did it alone. We wanted the company and power for ourselves. Chuck is innocent and I'm sorry for what we've done. Mom and Chuck, please take care of my children....

(Lake R. vol. 10 at 1444) In exchange for these services, Saltz testified, Charles agreed to give Saltz $20,000, hire a lawyer for him, and make him a partner in the business. (*Id.* at 1436–37).

### 2. Developments Since Trial.

Many of Albanese's claims for habeas corpus relief focus on the reliability of the scientific evidence recited in *Albanese I* and set forth above. Albanese contends that the forensic tests showing high levels of arsenic in the bodies of the murder victims were unreliable. The tests were performed by a laboratory which, subsequent to the trials and direct appeals, was roundly criticized by state officials for numerous and serious methodological inadequacies. These criticisms were issued several years after the toxicology tests in question were performed and did not specifically address those results.

Samples of tissue from the three victims were quantitatively tested for arsenic by the Illinois Department of Public Health Toxicology Laboratory (hereinafter "Toxicology Laboratory") between May and September 1981. (McHenry R. vol. XXXIII at 12, 18, 20–21, 24, 26; Lake R. vol. 9 at 1185, 1193). The Toxicology Laboratory was under the direction of Chief Toxicologist Dr. John Spikes and Assistant Chief Toxicologist Dr. Joerg Pirl. The testing in Petitioner's case was primarily performed by chemist Fred Townsend. All three men testified at Albanese's trials. Townsend testified that he tested the tissue samples using the Gutzeit method of quantitation and reported his specific findings. (McHenry R. vol. XXXIII at 4–51; Lake R. vol. 9 at 1180–1209). Dr. Pirl provided testimony regarding normal levels of arsenic in various tissues and compared those levels to the Gutzeit results obtained by Townsend and reviewed by himself. (McHenry R. vol. XXXIII at 52–103; Lake R. vol. 9 at 1211–39). Dr. Spikes testified about the effects of arsenic poisoning on the body and methods of testing tissues for arsenic. (McHenry R. vol. XXX at 359–98; Lake R. vol. 9 at 1150–80).

The results of the testing were dramatic. The examples listed below are from the testimony regarding Mary Lambert, but they are representative of the dozens of tests performed on tissue samples of the other victims in that they show large concentrations of arsenic in the body.

| Tissue | Normal Level | Level in Lambert Tissue |
|---|---|---|
| nails (proximal) | 200 micrograms | 6,500 micrograms |
| hair (distal) | 200 micrograms | 400 micrograms |
| liver | 10 micrograms | 440 micrograms |
| gastric contents | 200 micrograms | 16,800 micrograms |

(McHenry R.Vol. XXXII at 72–76).

In the spring of 1985, three years subsequent to Albanese's trials, and four years after the tests were performed, the Toxicology Laboratory and its personnel, including Drs. Spikes and Pirl, came under severe criticism for poor evidence handling and testing procedures. The Toxicology Laboratory was closed by the Department of Law Enforcement, now called the Department of State Police, after investigators determined that the Laboratory had "routinely failed to protect the chain of custody in cases submitted to it and had consistently and habitually produced inaccurate analyses of evidence." (Department of Law Enforcement "Toxicology Final Report," at 1). The investigation was triggered when the Toxicology Laboratory lost crucial evidence in a case in which law enforcement officials were trying to determine whether parents had intentionally poured acid down their child's throat. (*Id.* at 3). Various reports were prepared about the functioning of the facility, detailing numerous failings in health and safety practices, testing protocols, scientific equipment condition and maintenance, and management of technical staff. (*Id.* at 30–32; Report of Dr. Randall Baselt, May 24, 1985; Report of Director of Public Health Thomas Kirkpatrick, Jr., March 26, 1985).

Albanese argued at the May 19–21, 1986 post conviction evidentiary hearing in the McHenry County case that these developments showed that the scientific evidence used at trial was "inaccurate, unreliable and untrustworthy." (Petitioner's Br. on Post Conviction Appeal at 29). In addition to the reports mentioned above, Albanese also presented a report by Dr. Alphonse Poklis criticizing the methodology used by chemist Townsend in testing the samples in Albanese's case. Dr. Poklis, Director of St. Louis University School of Medicine Division of Forensic and Environmental Pathology, concluded from his review of the medical and toxilogical testimony and records that the quantitative analysis of specimens by the Toxicology Laboratory was "meaningless."

None of these reports was accepted as substantive evidence at the post conviction hearing because Albanese failed to produce witnesses or affidavits to vouch for their truth or accuracy. (Post Conviction R. vol. II at 283, 291). Instead, the reports were admitted for the limited purpose of preserving the record as to what Andrea Lyon, Albanese's expert witness on effectiveness of counsel and the handling of capital cases, relied upon in reaching her opinion as to the effectiveness of Albanese's attorney. (*Id.* at 282–83). On appeal, the Illinois Supreme Court considered the reports and assumed their accuracy, but determined that the information contained therein did not entitle Albanese to a new trial. *Albanese III*, 125 Ill. Dec. at 842–43, 531 N.E.2d at 21–22.

### ANALYSIS

Charles Albanese [9] has raised nineteen claims of constitutional error stemming from his convictions for murder and attempted murder ("conviction claims"), and his sentences ("sentence claims").[10] In reviewing his convictions and sentences, the court is mindful that its task is "to ensure that [Albanese was] not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera v. Collins,* — U.S. —, —, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993); *see Jackson v. Virginia,* 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 2796, n. 5, 61 L.Ed.2d 560 (1979) ("habeas corpus is not intended as a substitute for appeal, nor a device for reviewing the merits of guilt determinations.... Instead, it is designed to guard against extreme malfunctions in the state criminal jus-

---

9. For the sake of clarity, Charles Albanese will be referred to as "Albanese" or "Petitioner" for the remainder of this opinion. Other members of the Albanese family will be referred to by their first names.

10. These claims were presented in a Petition and Supplemental Petition for Writ of Habeas Corpus. Albanese's claims are set forth in an appendix to this opinion. Because Albanese has not specified which claims attack which conviction or sentence, the court assumes that each claim is asserted against both trials, unless it clearly appears otherwise. The claims and supplemental claims have been renumbered for ease of reference.

tice systems.") (Stevens, J. concurring in judgment) (citation omitted).

### Part One: Conviction Claims.

Albanese argues that his convictions cannot stand for any one of the following reasons: First, he received ineffective assistance of counsel (Claims 1(a)–1(n)); Second, the trial court erred in allowing the jury to be death qualified under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and in allowing expert testimony regarding Albanese's financial condition (Claims 2, 3); Third, the evidence was insufficient to support Albanese's convictions (Claims 4, 5); and Fourth, the State violated his rights by withholding evidence that the Toxicology Laboratory which tested tissue samples of the victims was grossly inadequate contrary to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (Claim 6), and by soliciting, or knowingly permitting, the introduction of perjured or patently false evidence (Claims 7–12).

### I. Ineffective Assistance of Counsel.

### A. Applicable Standards.

The Sixth Amendment guarantees criminal defendants the right to effective counsel. *United States v. Donaldson*, 978 F.2d 381, 394 (7th Cir.1992). Claims of ineffective assistance of counsel are governed by the two-part test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed on such a claim, the habeas petitioner must show both that the attorney's performance was deficient, and that the deficiency prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064. "Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* As this statement of the test makes clear, a petitioner bears a considerable burden in establishing ineffective assistance of counsel.

Under the first prong of the test, an attorney's performance must be evaluated for reasonableness on the facts and circumstances of the particular case viewed as of the time of counsel's conduct. *Id.* at 690, 104

S.Ct. at 2066. Review of counsel's performance is to be "highly deferential.... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). Hindsight and "Monday morning quarterback[ing]" are to be avoided. *See United States v. Donaldson*, 978 F.2d at 394.

Under the second prong of the test, the petitioner must "affirmatively prove prejudice," meaning that he or she must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693–94, 104 S.Ct. at 2067–68. The test, however, is not simply whether the outcome of the trial would have been different absent the error:

> [A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Lockhart v. Fretwell*, — U.S. —, — —, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993) (citation omitted). The inquiry, instead, is whether the attorney's performance was adequate to allow the adversarial *process* to operate in the particular case: "We reiterate that *Strickland* requires us to focus, not upon whether counsel could have done a better job, but upon whether counsel provided the assistance necessary to ensure the fundamental fairness of the proceeding whose result is being challenged." *Resnover v. Pearson*, 965 F.2d 1453, 1460 (7th Cir. 1992), *petition for cert. filed* (Feb. 26, 1993).

In *Strickland*, the Court suggested that, as a practical matter, considering the prejudice

prong of the test first would often resolve the ineffectiveness challenge without the need to judge the attorney's performance. In the current case, many of Albanese's claims can be resolved by reference to the performance prong of the test. The court will address each of Albanese's claims of ineffectiveness in turn.

#### B. Performance of Albanese's Attorney.

Albanese was represented by Richard C. Kelly in both the McHenry trial and the Lake trial. The judge presiding over the post conviction evidentiary hearing determined that Kelly was "an experienced criminal law trial attorney." (Post Conviction R. vol. II at 291). The record bears this out. Kelly testified that he had been licensed to practice in Illinois since 1967. He had experience as an Assistant State's Attorney in Cook and McHenry Counties, an Associate Judge in McHenry County, and as a private practitioner. Sixty to 70% of Kelly's practice consisted of criminal matters. At the time of the hearing, Kelly had tried approximately 148 jury trials, including 140 criminal matters. Seventy of these involved felonies, 20 involved Class X felonies. Further, Kelly testified that he had tried eleven homicide cases. The Albanese case was the first capital case Kelly had ever tried. (Post Conviction R. vol. IX at 421–28, 462–63).

Albanese's ineffectiveness claims challenge Kelly's case preparation, generally and with regard to both the scientific and financial evidence. In addition, Albanese urges the court to find Kelly's strategic decisions constitutionally deficient.

#### 1. General Preparation.

Claim 1(a) asserts that Kelly "[f]ailed to consult with any attorneys experiencing [sic] capital litigation." Kelly disputed this at the post conviction hearing, claiming that he contacted the Cook County Public Defenders Office to obtain information about capital cases. (Post Conviction R. vol. IX at 476, 480–81). Kelly also testified that he reviewed all of the then reported Illinois death penalty cases prior to trial. (*Id.* at 463).

Albanese contends that "qualitative differences from capital litigation to other criminal trials and Kelly's lack of experience therein, made it incumbent upon him to do substantially more preparation than would be necessary in a normal criminal case at which he was experienced. In these circumstances, effective assistance of counsel must include talking to some experienced attorney at length as to the differences in capital litigation from other criminal litigation." (Petitioner's Resp. to Mot. to Deny Pet. at 7). Albanese cites no authority for his conclusion that only "lengthy" discussion with "some experienced attorney" is a prerequisite to effective representation, and this court has found none. In fact, *Strickland* teaches that effectiveness of counsel in the type of adversarial capital sentencing proceeding applicable in Illinois is governed by the same standard as for the guilt phase of trial. 466 U.S. at 686–87, 104 S.Ct. at 2064 ("For purposes of describing counsel's duties, therefore, Florida's [adversarial] capital sentencing proceeding need not be distinguished from an ordinary trial."). The *Strickland* court specifically declined to impose on counsel "detailed rules" or "guidelines" for effective assistance. *Id.* at 688–89, 104 S.Ct. at 2065. Consulting an attorney experienced in the particular matter would certainly be prudent, but is by no means constitutionally mandated.

At the post conviction hearing, Kelly alluded to another factor bearing on the reasonableness of his research into capital litigation. Kelly filed his appearance on February 22, 1982. (McHenry R. vol. I at C–64). The Illinois death penalty statute, enacted in 1977, Ill.Rev.Stat. ch. 38, § 9–1, was upheld against constitutional attack on November 21, 1979. *People ex rel. Carey v. Cousins*, 77 Ill.2d 531, 34 Ill.Dec. 137, 397 N.E.2d 809 (1979), *cert. denied sub nom., Brown v. Illinois*, 445 U.S. 953, 100 S.Ct. 1603, 63 L.Ed.2d 788 (1980). Between the date *Carey* was decided and the date Kelly came into the case, only nine appellate opinions discussing the death penalty in any detail were issued. As Kelly testified, there was no surplus of experts on capital litigation in Illinois with whom to consult, at length or otherwise. (Post Conviction R. vol. IX at 463).

■ Claims 1(m) and (n) address the adequacy of Kelly's preparation and his decision *not* to seek continuances. Kelly failed "to request a continuance when he was advised of the State's intent to seek the death penalty," (Claim 1(m)) and failed "to seek a continuance, even though he became involved approximately, only one month prior to commencement of trial in a capital case, and he had no previous capital experience." (Claim 1(n)). The State contends that these claims have been procedurally defaulted for failure to raise them in the state courts. The court rejects this contention as an overly narrow view of fair presentment.

While it is true that Albanese did not present these claims in precisely the same language as they appear here, the Illinois courts had a full opportunity to consider Albanese's assertion that Kelly was inadequately prepared for trial. In *Albanese III,* the Illinois Supreme Court specifically addressed claims that Kelly's representation was deficient because he was "ill-prepared for trial" and that he "prepared for trial in less than one month." 125 Ill.Dec. at 840, 531 N.E.2d at 19. In his brief before the court in *Albanese III,* Albanese argued that "trial counsel was ill prepared ... and went to trial without a request for additional time within weeks of retainer." (Petitioner's Post Convention Br. at 4). This, combined with Albanese's other claims in the state courts about Kelly's lack of experience with capital litigation, sufficed to preserve the matter for federal habeas review. The claims, however, fail on the merits.

■ Under *Strickland,* to succeed on Claims 1(m) and (n), Albanese must overcome the presumption that under the circumstances as they existed in 1982, Kelly's failure to seek continuances " 'might be considered sound trial strategy.' " *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. At the post conviction hearing, Kelly explained that he had not sought a continuance before trial for two reasons. First, Albanese had already been incarcerated for more than ninety days. Second, Kelly testified that he believed going to trial sooner was to Albanese's advantage because the prosecution's case was entirely circumstantial. (Post Conviction R. vol. IX at 471). This strategic decision is not objectively unreasonable; Kelly could have rationally believed that forcing the State to go to trial earlier rather than later would result in some "holes" in the State's circumstantial case remaining unfilled. Albanese has not offered any persuasive argument to overcome the presumption that Kelly's actions were reasonable; therefore, Claims 1(m) and (n) provide Petitioner with no basis for relief.[11]

## 2. Preparation for Scientific Evidence.

■ Claim 1(b) asserts that Kelly "[f]ailed to obtain and consult with an expert in chemistry or toxicology, who could have refuted or discredited the expert testimony of the State's expert witnesses." The record from the post conviction hearing is clear that Kelly did consult an expert on arsenic poisoning, Dr. Shirley Conibear, before trial. Albanese asserts, however, that Dr. Conibear was not the right *kind* of expert; according to Albanese, Kelly should have retained a chemist or toxicologist who was familiar with methods employed to quantitate arsenic in substances. (Petitioner's Resp. to Mot. to Deny Pet. at 8). This claim invites the kind of hindsight analysis of counsel's performance prohibited by *Strickland.* The question is not what would be reasonable preparation and investigation now, when it is a matter of public record that the Toxicology Laboratory which performed the quantitative arsenic tests was closed by the state for serious inadequacies. Rather, the question is whether Kelly's investigation and prepara-

---

11. These two claims alleging inadequate time to prepare for trial and sentencing apply only to the McHenry trial. Kelly filed his appearance in Lake County on February 18, 1982 and trial commenced nine months later in October 1982. Albanese has not argued that this amount of time was inadequate for Kelly to prepare an effective defense. After his client was convicted and sen- tenced to death in the McHenry trial, Kelly filed a motion to withdraw as counsel before trial in Lake County. Albanese told Lake County Circuit Judge Lawrence Inglis that he was satisfied with Kelly's performance and wished the representation to continue. (Post Conviction R. vol. IX at 428).

tion were reasonable in 1982, three years before the laboratory was closed.

The post conviction record reveals that Kelly enlisted Mel Wallace, a professor of criminal justice at McHenry County College, to locate an expert in arsenic poisoning. Wallace made at least a dozen calls looking for an arsenic expert. (Post Conviction R. vol. IX at 85–87). Kelly testified that he contacted a toxicologist named Gayle Marks, described the case to her, and was told that an expert in arsenic poisoning would be of more help than a toxicologist. According to Kelly, it was Dr. Marks who referred him to Dr. Conibear. (Post Conviction R. vol. IX at 432). This version of the facts did not go undisputed. Dr. Marks filed an affidavit stating that, to the best of her recollection, Kelly never contacted her about the Albanese case. The post conviction judge did not expressly resolve this factual conflict: did Kelly contact Dr. Marks or not? Given the judge's ultimate conclusion that Kelly's investigation was reasonable under the circumstances, it is implicit that he credited Kelly's testimony. Determinations of credibility are the province of trial judges who observe the witnesses in question, *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983), and are not to be reevaluated by federal courts hearing habeas cases.[12]

According to Kelly's version of the facts, he contacted the type of expert (a toxicologist) Albanese claims would have been proper, and the toxicologist told him to contact an expert in arsenic poisoning, Dr. Conibear. After reviewing medical records, autopsy reports, and arsenic test results, Dr. Conibear told Kelly that Lambert and Mueller had died of arsenic poisoning. (Post Conviction R. vol. VIII at 398, 401). She noted that the symptoms of the surviving victims were definitely caused by arsenic.[13] In addition, she

told Kelly that the date of arsenic ingestion by Mueller and Lambert was August 3, 1980, the day of the last Albanese family dinner. (*Id.* at 401–02). Under these circumstances, it would have been reasonable for Kelly to conclude that a battle of the experts on the medical evidence was not in his client's best interests.

Although Albanese asserts that Dr. Conibear was the *wrong* expert witness, he has never presented the *right* expert witness, or shown that the right witness would have testified favorably to the defense. Albanese offered into evidence at the post conviction hearing two reports authored by Dr. Baselt and Dr. Poklis, respectively. The Baselt report, written in 1985, criticized the procedures followed by the Illinois Department of Public Health Toxicology. The Poklis report, written in April 1986, directly attacked the toxicology reports used at Albanese's trial. As was noted *supra* at 15, Albanese did not offer any authentication for the reports. The post conviction judge admitted these reports for the limited purpose of preserving the record on the issue of ineffective assistance of counsel. (Post Conviction R. vol. II at 282–83). Albanese had offered the testimony of Ms. Andrea Lyon, an attorney specializing in capital crime litigation, who opined that Kelly was ineffective due to his failure to discover the types of irregularities at the Toxicology Laboratory reported by Drs. Baselt and Poklis. Obviously, Albanese knew of Dr. Poklis and Dr. Baselt in May of 1986 (the date of the post conviction hearing). Yet he did not present their testimony by deposition, affidavit, or otherwise. The record does not reveal that Albanese even attempted to offer the type of authenticating evidence necessary to admit the Baselt and Poklis reports as substantive evidence.[14] Albanese has not, therefore, established that had Kelly contacted the "right" expert, that

---

12. The court, of course, does not defer to the post conviction judge's conclusion that Kelly's investigation was reasonable, reasonableness being a mixed question of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *see Wright v. West,* —— U.S. ——, ——–——, 112 S.Ct. 2482, 2488–89, 120 L.Ed.2d 225 (1992).

13. Dr. Conibear apparently was confused regarding M.J.'s presence among the living.

14. Albanese had notice that such supporting evidence was required, at the latest, when the judge ruled that the reports were inadmissible as substantive evidence. Conceivably, Albanese could have requested a suspension of the post conviction hearing to obtain the required authentication.

expert would have testified at trial that the quantitative tests for arsenic were unreliable. Having failed to demonstrate that Kelly's representation was deficient with regard to consulting and hiring an expert, Albanese cannot obtain relief from his convictions based on Claim 1(b).

Claim 1(c) is similar to 1(b): Kelly's representation was ineffective because he "[f]ailed to adequately educate himself in the field of toxicology, specifically with respect to arsenic poisoning and the methodology employed in investigating the same." Albanese's argument is based on speculation and hindsight. Under the scenario envisioned by Albanese, Kelly would have learned enough about arsenic testing methodology to establish that the Toxicology Laboratory tests were unreliable; in other words, he would have come to the same conclusion as Dr. Poklis. As discussed above, Albanese has failed to present substantive evidence that the test results actually were unreliable, despite the fact that, with the passage of time from 1981 to 1986, the Toxicology Laboratory had been closed, providing Albanese with many more clues to possible testing irregularities than Kelly had had in 1982.

A review of the trial transcripts reveals that Kelly had familiarized himself with arsenic testing technologies. He consistently elicited testimony on cross-examination from the prosecution's experts that the Gutzeit method of quantitating arsenic in tissues was well over one hundred years old, and that more modern methods were available. He questioned the State's experts about the history, sensitivity, and accuracy of these other methods, which included atomic absorption spectrometry, neuron activation analysis, and x-ray fluorescence. (*See* McHenry R. vol. XXXII at 84–89).

In closing argument in the McHenry trial, Kelly noted that the equipment necessary to perform the more modern and accurate atomic absorption test was available in the Department of Public Health's Springfield laboratory. (McHenry R. vol. XXXVI at 117–18). Kelly also took full advantage of the weak testimony of Fred Townsend, the chemist who performed the tests in question. Townsend, as Kelly pointed out in closing

argument, had not been able to remember the name of the college he attended on the stand. Kelly questioned the ability of this 71–year–old chemist to perform the various complicated steps involved in the Gutzeit test and to interpret the results:

> Fred Townsend is a nice old elderly gentleman, and I have nothing against him because of his age. But he should have been retired from the Department of Toxicology years ago. And very simply why? Because he got up there on the stand, and he couldn't even remember the name of the college that he went to. But yet he took this test. . . . and he couldn't remember any of the dates that he performed it. . . .
>
> Now, how many steps were there to this [Gutzeit] test that this man had to perform? . . . first of all, [Townsend] said that the sample . . . has to be prepared in a kjeldahl solution, liquified and colorless. The second step is placing this solution into the Gutzeit apparatus. . . . Then it is diluted to a standard variance with distilled water. Then hydrochloric acid is added; two milliliters—and [Townsend] was very specific about that—of potassium iodide is added. When the vapor is in the upper column, zinc is added. This test must be done at zero degrees Fahrenheit temperature.
>
> Now, here's a man who couldn't remember the name of his college; and he's performing this test. And this is only about half way through the test. . . .

(McHenry R. vol. XXXVI at 115–17).

At the post conviction hearing, Kelly testified that Dr. Conibear gave him several text books on toxicology, and that he read them in preparation for trial. He kept these books with him at counsel table and occasionally used them in conducting cross-examination. (Post Conviction R. vol. IX at 435–36). Perhaps Kelly could have mounted a better defense, but that is not the inquiry. To obtain habeas relief, Petitioner is required to overcome the presumption that Kelly's preparation was adequate and his performance sufficient to ensure the fundamental fairness of the trial proceedings. *See Resnover v. Pear-*

*son*, 965 F.2d at 1460. Petitioner has not done so; relief based on Claim 1(c) is denied.

■ Claim 1(h) concerns arsenic testing performed on various tissue samples and other objects by the Northern Illinois State Crime Laboratory ("Crime Laboratory"), not to be confused with the Department of Public Health Toxicology. Specifically, Albanese contends that Kelly's representation was ineffective because he "[f]ailed to rebut evidence of the testing done by the Northern Illinois State Crime lab which indicated the presence of arsenic [in] several *items* relevant to petitioner's case, although he was aware that the qualitative nature of that testing, as opposed to quantitative testing, was invalid for the purposes for which the testing was done." (Emphasis added). Albanese has not challenged the methodological validity of the qualitative tests. Rather, Albanese asserts that the very nature of the tests made them invalid for "criminal investigatory purposes." (Petition at ¶ 33).

This claim has its origin in Dr. Conibear's testimony at the post conviction hearing that the qualitative tests on non-tissue samples were "worthless," and that she so informed Kelly prior to trial.

> I told [Kelly] that some of what I would call the environmental measurements of arsenic in *things other than people's bodies* I felt were not valid. They were what I would call qualitative. That is they said yes, there was arsenic there. They didn't say how much. They didn't quantitate the arsenic. And, I told him that arsenic was present in many things and that this did not demonstrate that these items had not been the source of the poisoning .... The fact that the tests themselves [on the non-tissue] were not quantitative meant that they really were worthless.

(Post Conviction R. vol. VIII at 403–04) (emphasis added).

The Crime Laboratory tested samples of hair and fingernails from various individuals and certain other non-tissue objects for the presence of arsenic using the x-ray fluores-cence method. Chief Chemist Andrew Principe testified in both trials that the Crime Laboratory tested samples qualitatively only; any arsenic found to be present was not quantitated. Specifically, Principe testified at the McHenry trial that arsenic was present in the nails and hair of Mary Lambert; arsenic was present in the hair of Marion Mueller; arsenic was present in Michael's hair and nails. No arsenic was found to be present in the hair or nails of Charles Albanese; no arsenic was detected in the hair or nails of employees of Allied Die Casting Corporation.[15] Arsenic was not detected in soil samples taken from around Marion Mueller's grave, although other elements were detected. Objects tested for the presence of arsenic included a jar, a thermos bottle, and cookie crumbs. The contents of a jar was tested, revealing the presence of arsenic and no other elements.[16] A scraping from Michael's thermos showed the presence of arsenic, while a sample of the thermos bottle itself did not. Crumbs from a cookie jar tested positive for the presence of arsenic. (McHenry R. vol. XXXIII at 75–97, 109).

There were fewer Crime Laboratory test results presented at the Lake County trial because the murder of M.J. and attempted murder of Michael were not at issue. Principe testified that the Crime Laboratory had performed qualitative, not quantitative, tests for the presence of arsenic in hair, nail, soil, and embalming fluid samples. The results were as follows: arsenic was present in Marion Mueller's nails and in Mary Lambert's hair; arsenic was not detected in samples of soil from either woman's grave, nor in samples of embalming fluid; arsenic was not present in samples of hair and nails from Charles Albanese. (Lake R. vol. 9 at 1275–80).

Although Claim 1(h) has not been clearly argued, the court infers from the record and briefs filed on post conviction review and in support of the Petition, that Albanese is claiming that the tests on the jar, the cookie

---

**15.** Hair samples were taken from twenty-seven employees and nail samples were taken from 21. (McHenry R. vol. XXXIII at 87, 89).

**16.** This was apparently the jar of arsenic that Reichel gave to Albanese at his request.

crumbs, and thermos bottle were worthless.[17] More importantly, Albanese argues that Kelly knew those tests were worthless because Dr. Conibear so informed him. The reason the tests were worthless, according to Dr. Conibear, was that a mere determination that the crumbs and thermos contained arsenic could not establish that lethal doses of arsenic were delivered from those sources. (Post Conviction R. vol. VIII at 403). After all, as was pointed out during both trials, arsenic is an elemental substance, present in many objects, including humans, naturally.[18]

Kelly disputed Dr. Conibear's testimony. He testified at the post conviction hearing that Dr. Conibear never told him the qualitative tests were worthless. (Post Conviction R. vol. IX at 453). The judge did not resolve this conflict. It is not the province of this court to weigh the credibility of these witnesses, and in this case it is also unnecessary. If the court were to presume that Dr. Conibear's testimony was correct, and that Kelly had notice that the qualitative tests were incompetent to show that the cookies and thermos were the vessels for poisoning, then Kelly's performance in this particular could conceivably constitute deficient assistance under *Strickland*. If the tests on the cookies and thermos bottle were worthless, then the State's theory in the McHenry case was faulty in positing the methods by which Albanese introduced arsenic to his father M.J. (through cookies) and his brother Michael (thermos of soup). The State emphasized this evidence in urging that Albanese had *opportunity* to commit the crimes charged. (McHenry R. vol. XXXVI at 72–75). The story presented by the State about poisoned pea-soup and cookies must have had some prime-time drama appeal to the jury, which Kelly might have been able to contradict, given what he knew *at the time of the McHenry trial,* not at some future time.

The court does not and need not decide whether Kelly's performance was deficient in this regard, however, because Albanese has not shown prejudice, the second hurdle to be cleared under the *Strickland* test. In order to establish prejudice, Albanese must show that the result of the McHenry trial probably would have been different, but for Kelly's failure to challenge the cookie and thermos tests, such that confidence in the outcome of the trial is undermined. *See Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. Albanese has not done so. The State presented other evidence to show that Albanese had access to all of the murder victims. The cookie jar and thermos bottle tests purported to *pinpoint* how arsenic was introduced to M.J. and Michael, but other evidence showed that Albanese worked with M.J. and Michael on a daily basis at the offices of Allied Die Casting. That evidence of opportunity would have remained, even if Kelly had argued that the cookie and thermos tests were inconclusive. Albanese has shown neither a probability that he would have been acquitted had Kelly done as Albanese now suggests, nor that the alleged error rendered his trial unreliable.

### 3. Preparation for Financial Evidence.

■ In Claims 1(d) and 1(e), Albanese contends that Kelly's representation was ineffective because he "[f]ailed to obtain an expert witness in the field of accounting in time to adequately examine the State's case with respect to Petitioner's financial status" and "[f]ailed to adequately provide the accountant that was employed with sufficient

---

**17.** It does not appear that Albanese is arguing that the qualitative tests on the hair and nail samples were without probative value. Indeed, the fact that some hair and nail tests showed the presence of arsenic while others did not, reveals that even the qualitative x-ray fluorescence test has a quantitative aspect: if every person's body contains arsenic naturally, Charles Albanese and twenty-seven Allied Die Casting employees would not have tested negative for the presence of arsenic. Principe testified that the tests on samples of Albanese's hair and nails "did not reveal the presence of *any* arsenic." (Lake Volume 9 at 1276) (emphasis added). Obviously, there is

some sensitivity limitation to the test; when arsenic is present below a certain level, the x-ray fluorescence test yields a negative result.

**18.** John Spikes, Chief Toxicologist at the Public Health Laboratory, testified that arsenic is a naturally occurring substance, present in every human body. He testified that the normal level of arsenic in one individual may be higher than that found in another individual, differences being caused by occupational exposures and other factors. (Lake R. vol. 9 at 1164; McHenry R. vol. XXX at 363, 369, 372, 383).

documentation to thoroughly analyze Petitioner's financial status and give an unqualified opinion of same."

The State posited that Albanese's motive for the murders was to improve his precarious financial position. Kelly countered with evidence at the McHenry trial, in the form of expert testimony, that Albanese's financial condition was not "critical," as urged by the State. Albanese now challenges Kelly's preparation of the expert witness, James Woods.[19] Albanese argues that errors in the State's financial case, overstating items of expense and failing to show items of income, were crucial because his supposed motive for murder becomes weaker with every dollar added to the asset column. That argument is beside the point. The question is whether Kelly's representation fails constitutional muster due to his handling of the financial aspect of the State's case. On this issue, Albanese cannot overcome Strickland's prejudice hurdle, because he has not shown that Kelly could have found a credible accounting expert to testify that Albanese was in good financial condition.

At the post conviction hearing in McHenry County, Albanese presented Terry Hall, a CPA practicing mainly as a professional witness. In preparation for her testimony, Ms. Hall reviewed Albanese's financial records and talked with Albanese himself, whom she found to be well acquainted with his business affairs. (Post Conviction R. vol. VIII at 275). Ms. Hall testified that Albanese's financial condition in 1980 was "terrific." (Id. at 274). Hall testified that the financial evidence presented by the State at the McHenry trial did not include all of Albanese's income and assets. (Id. at 268). On cross examination, Hall admitted that in reaching her opinion she had not considered Albanese's delinquent mortgage and child support obligations, or the precariousness of his job. (Id. at 290–94). In his written opinion, the post conviction judge found that Hall's credentials and credibility were "substantially undermined by cross examination so as to render her testimony unpersuasive." (Post Conviction R. vol. II at 285).

In order to show prejudice, Albanese would have to show that the result of the trials would have been different but for Kelly's failure to obtain and prepare an accounting expert to challenge the State's case and to give an unqualified opinion of Albanese's financial condition. See Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. The outcome might arguably have been different if the defense had totally undercut the State's theory of motive by showing that Albanese did not have financial problems before the murders. Given Albanese's inability to find a credible expert to testify at the post conviction hearing in 1986 that his finances were good, Albanese cannot realistically claim that he was prejudiced by Kelly's failure to do so in 1982, while operating under pre-trial time pressures. Instead, the most Albanese has shown is some possible inaccuracies in the State's financial evidence.

The Illinois Supreme Court determined twice that even if the alleged inaccuracies in the State's evidence were accepted as true, they would not have undermined the State's proof of motive. The suggested inaccuracies are minor; on appeal from his Lake County conviction, Albanese

> urg[ed] the court to adopt calculations he offer[ed] here for the first time, which produce an increase in his cash assets and a decrease in expenses. However, as [Albanese] acknowledges, the revised financial data do not alter the result that he overspent his income in 1980. Moreover, his revisions do not detract in any way from the State's evidence summarizing defendant's obligations and arrears in the critical months of July and August of 1980.

Albanese II, 85 Ill.Dec. at 444, 473 N.E.2d at 1249. On post conviction review, where Albanese again challenged the accuracy of the State's financial evidence, the Illinois Supreme Court noted: "there is no dispute that as a result of the deaths [Albanese] experienced financial gains that eased a financially tight situation, and moving numbers from one side of the ledger to another could not have altered that fact." Albanese III, 125 Ill.Dec. at 841, 531 N.E.2d at 20. Claims

19. Kelly did not offer expert testimony on Albanese's finances in the Lake County trial.

**542**

1(d) and 1(e) provide no basis for habeas corpus relief.

#### 4. Trial Strategies.

█ In Claim 1(f), Albanese contends that Kelly's representation was ineffective because he "[f]ailed to interview the State's expert witnesses in advance of trial." The State called Kelly as a witness at the post conviction hearing. Kelly testified then that he did not interview the State's expert witnesses in advance of trial as a matter of trial strategy. Kelly stated that it was his normal policy not to interview such witnesses, in order to avoid alerting them to areas of likely cross examination. (Post Conviction R. vol. IX at 466). Kelly testified to other aspects of his usual trial strategies, stating that he normally interviewed fact witnesses before trial without taking notes, in order to avoid having to disclose such notes to the prosecution. (*Id.* at 448, 453).

Under *Strickland,* Albanese must overcome the presumption that under all the circumstances, Kelly's decision not to interview the State's expert witnesses in advance " 'might be considered sound trial strategy.' " *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Albanese has not overcome that presumption because his challenge to Kelly's strategy is based on exactly the type of hindsight that *Strickland* warns against. Albanese's argument combines what Kelly "should" have done, what he "might" have understood from the recommended investigation, and what the resulting evidence "could" then have shown:

> If Kelly had taken the time to interview the State's witnesses prior to the trial, he may have understood the procedures which they employed to conduct their test. He then would have been able to have a meaningful discussion with expert witnesses in the field of toxicology as to the reliability of the methods employed by the State's witnesses. He then should have realized that Dr. Conibear was not the type of expert that he needed for preparing this case. He then, naturally, would have pursued other experts such as Dr. Alphonse Poklis, who was obtained by [Albanese's post conviction counsel] subsequent to the convictions in this case. Such an expert would have been capable of di-

secting [sic] the procedures employed by the State's expert witness and determining the flaws therein. Kelly then could have been successful at either discrediting or suppressing the evidence that purported to establish the proof that the murder victims in this case had been exposed to lethal doses of arsenic. Without these laboratory results, Dr. Helen Young [the State's expert] could not have formed an opinion as to the cause of death. The cause of death then would not have been proven beyond a reasonable doubt to be homicide.

(Petitioner's Resp. to Mot. to Deny Pet. at 11). This string of possible events is too tenuous; Albanese is hypothesizing an alternative outcome of the trial based on what a certain course of conduct might have revealed. Albanese has not shown that Kelly's approach was unreasonable given the circumstances as they existed in 1982. Albanese's argument here repeats those addressed *supra* at 25–26 as to Claim 1(b), regarding Kelly's failure to obtain the "right" expert witness. As noted there, Albanese has not presented substantive evidence that the "right" witness existed, despite having had a full opportunity to do so at the post conviction hearing. The court finds that Albanese has not shown that Kelly's choice not to interview expert witnesses before trial was "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

█ In Claims 1(g) and 1(i), Albanese contends that Kelly rendered ineffective assistance due to his failure "to investigate leads provided to him by Dr. Conibear in investigating the problems with the Department of Public Health Toxicology Laboratory, although such information came to his attention" and his "failure to consult with any expert as to the reliability of the testing procedures employed by the State's expert witnesses." The background to these claims has been set forth *supra* at 12–15. These claims address the revelation, subsequent to Albanese's trials and direct appeals, that the Toxicology Laboratory was closed by the State of Illinois in 1985 due to inadequacies in its testing procedures. It was this laboratory which performed the quantitative tests

for arsenic in the tissues of the victims upon which the State's expert relied in opining that arsenic poisoning was the cause of each death. Albanese argues that the problems with the Toxicology Laboratory's procedures exposed in 1985 render the arsenic test results obtained in 1981 unreliable. Further, Albanese contends that Kelly should have discovered these problems and undercut the State's evidence that arsenic poisoning caused the deaths of Marion Mueller, Mary Lambert, and M.J.

Albanese raised the issue of the reliability of the Toxicology Laboratory in his post conviction petitions, and was given the opportunity for a full evidentiary hearing on that issue in the McHenry County post conviction proceeding. As evidence, Albanese offered three reports about the Toxicology Laboratory: (1) report dated March 26, 1985 by Director of Public Health Thomas Fitzpatrick, Jr.; (2) report of May 24, 1985 by Randall C. Baselt, Director of the Chemical Toxicology Institute; (3) report dated April 3, 1986 by Alphonse Poklis, Director of the Division of Forensic and Environmental Pathology of the St. Louis University Medical Center School of Medicine; and (4) Department of Law Enforcement "Toxicology Final Report." The Fitzpatrick and Baselt reports were the result of an investigation of the Toxicology Laboratory undertaken by the State of Illinois. The Poklis report was prepared at the request of Albanese's post conviction counsel. These reports were not admitted as substantive evidence because Albanese failed to come forward at the post conviction hearing with witnesses or affidavits to authenticate the reports or vouch for their truth or accuracy. The post conviction judge made the reports part of the record for the limited purpose of preserving the record of what another of Albanese's witnesses, Ms. Andrea Lyon, relied upon in reaching an

opinion as to Kelly's performance as counsel. (Post Conviction R. vol. II at 282–83).

Recognizing the potential seriousness of the issues raised in the reports, the Illinois Supreme Court considered the reports as if they were accurate and had been admitted as substantive evidence. *Albanese III*, 125 Ill. Dec. at 842, 531 N.E.2d at 21. After examining the reports in detail, that Court found that the information contained in them did not entitle Albanese to a new trial. *Id.* The court made several factual findings in the process of reaching its legal conclusion on the issue of granting a new trial.

Under § 2254(d), this court defers to the following factual findings of the Illinois Supreme Court, which it finds to be supported by the record. First, the reports do not indicate that the Toxicology Laboratory was experiencing extensive or grave problems in testing in 1981. *Id.* Second, the reports discuss testing irregularities in 1984 and 1985, but provide other evidence that the Toxicology Laboratory was functioning adequately in 1981. Specifically, the reports indicate that the Laboratory's most significant errors occurred in blood alcohol testing, but also that the Laboratory "performed very well" in blood alcohol testing from 1972 to October 1984. *Id.*, 125 Ill.Dec. at 841, 531 N.E.2d at 22. Finally, the Baselt report singled out the Laboratory's handling of a particular case of (non-fatal) arsenic poisoning for criticism, but did not mention the more serious case of Albanese. *Id.*[20]

It is against this background of the state of affairs at the Public Health Toxicology Laboratory in 1981 and 1982, that Albanese's Claims 1(g) and 1(i) must be examined. Albanese contends in Claim 1(g) that Kelly was ineffective as counsel because he did not follow a "lead" into Laboratory problems provided by Dr. Conibear. At the post conviction hearing, Dr. Conibear testified that

---

**20.** The tests in the arsenic poisoning case referred to by the Baselt report were performed in 1984 or 1985, the period in which the Laboratory was experiencing the most problems, according to the reports. *See Illinois v. Swango*, 144 Ill.App.3d 1187, 110 Ill.Dec. 305, 510 N.E.2d 1336 (1986). The Baselt report notes with regard to the *Swango* case, that the tests performed at the Laboratory neither confirmed nor refuted

criminal poisoning. (Baselt report at p. 7). The results in that case were also obtained using the Gutzeit method, but did not show high concentrations of arsenic, as did the results in Albanese's case. Therefore, no clear inference can be drawn that the Toxicology Laboratory generally overstated amounts of arsenic in specimens submitted for testing.

she told Kelly before Albanese's first trial that there were "problems" at the Toxicology Laboratory.[21] (Post Conviction R. vol. VIII at 414). She did not give any specific testimony the "problems," and stated that she was not familiar with the procedures or equipment used by the Laboratory. (*Id.* at 408–09). Albanese's argument that Kelly's failure to investigate this information from Dr. Conibear constituted deficient performance rests on conjecture.

> The fact that [Dr. Conibear] told [Kelly] there were problems with the lab *should* have been enough to cause him to investigate that rumor and determine *if,* in fact, the lab did have problems. *If* he discovered the lab did actually have problems, he would then have a duty to determine the nature and extent of the problems and present those to the fact finder who was to evaluate the evidence presented by that lab and use it in determining [Albanese's] guilt or innocence.

(Petitioner's Resp. to Mot. to Deny Pet. at 12–13) (emphasis added). Considering all of the circumstances of the case as they existed in 1982 before trial, Albanese has not persuaded this court that Kelly's failure to investigate the "rumor" that the Laboratory was not functioning properly was an unreasonable choice. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.") Given the nebulousness of the "lead," and Dr. Conibear's opinion that arsenic poisoning was the cause of the deaths, the decision not to investigate possible "problems" at the Toxicology Laboratory was not unreasonable and did not render Kelly's performance ineffective.

The fact that the Toxicology Laboratory was closed in 1985 invites curiosity and second guessing, but this court must strive to "eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. at 2065. Albanese has not provided any evidence that Kelly, or anyone for that matter, would have discovered problems at the Toxicology Laboratory, had he undertaken the investigation Albanese now claims was indispensable to constitutionally adequate representation of counsel. Similarly, Albanese has not shown that if Kelly had consulted with an expert about the State's testing procedures that serious errors would have been discovered. Accordingly, relief based on Claims 1(g) and 1(i) is denied.

### 5. *Procedural Matters.*

Claim 1(j) is defective because it was never fairly presented to the Illinois courts. This claim asserts that Kelly "[f]ailed to object to hearsay testimony of Donald Fishbein." Fishbein, the attorney for Allied Die Casting, testified regarding M.J.'s statements to Albanese during a company meeting at which Albanese was demoted.[22] On direct appeal of his McHenry conviction, Albanese argued that he should receive a new trial due to the admission of hearsay testimony by Fishbein. The Illinois Supreme Court found that the testimony "was not offered for the truth of the matter asserted, but for a nonhearsay purpose." *Albanese I,* 79 Ill.Dec. at 616, 464 N.E.2d at 214. Ineffective assistance of counsel was never raised on direct appeal of the McHenry conviction; it was raised in *Albanese II* (Lake County direct appeal) and *Albanese III* (post conviction appeal), but Fishbein's testimony was not the subject of any of the specific claims.[23]

**21.** In his testimony at the post conviction hearing, Kelly denied that Dr. Conibear ever mentioned such "problems" to him. (Post Conviction R. vol. IX at 455).

**22.** *See supra* at 6 for details of Fishbein's trial testimony.

**23.** In *Albanese II,* the specific claims against Kelly were as follows:

> trial counsel erred (1) eliciting, acquiescing in, and stipulating to evidence that tended to indicate arsenic-poisoning deaths are more often

the result of homicide than of any other cause; (2) failing to object to evidence of defendant's finances and to references to other crimes in the confession and suicide notes; (3) failing to objct to a statement in closing argument that defendant had been jailed for failure to pay child support; and (4) failing to examine the State's financial exhibits in sufficient detail to expose alleged flaws in testimony from the State's financial expert.

85 Ill.Dec. at 451, 473 N.E.2d at 1256.

In *Albanese III,* ineffective assistance of counsel was urged in the following claims:

■ Albanese has never "fairly presented" the question of whether Kelly's failure to object to Fishbein's testimony constituted ineffective assistance of counsel. *See Verdin v. O'Leary,* 972 F.2d 1467, 1472–74 (7th Cir. 1992). Instead, Fishbein's testimony was attacked solely on the grounds that its admission was erroneous under the law of evidence: "The testimony in issue was nothing more or less than an improperly offered and admitted opinion as to the meaning of another's inadmissible hearsay statement." (Petitioner's Br. in McHenry Appeal at 69). Albanese's argument to the state courts about Fishbein's testimony did not raise any federal issue under the test set forth in *Verdin* because it did not:

"(1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation...."

*Id.* at 1473–74. Because Albanese did not challenge Kelly's failure to object to Fishbein's testimony in constitutional terms in the state courts, this claim is procedurally defaulted. *Id.* at 1472 (citing, *Henderson v. Thieret,* 859 F.2d 492, 496 (7th Cir.1988), *cert. denied,* 490 U.S. 1009, 109 S.Ct. 1648, 104 L.Ed.2d 163 (1989)). The fact that Albanese presented the issue of ineffective assistance of counsel generally to the state courts is insufficient; it is Albanese's obligation to identify the specific acts and omissions of counsel that form the basis of an ineffectiveness claim, *Velarde v. United States,* 972 F.2d 826, 829 (7th Cir.1992) (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065).

The finding that Albanese has procedurally defaulted on Claim 1(j) does not necessarily end the inquiry. The default might have been excused if Albanese could have demonstrated cause for the default, and actual prejudice resulting from the alleged constitutional violation. *Wainwright v. Sykes,* 433 U.S. 72, 90–91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977); *United States ex rel. Sullivan v. Fairman,* 731 F.2d 450, 452–53 (7th Cir. 1984). Albanese, however, has not presented any arguments regarding cause and prejudice. Relief based on Claim 1(j) is denied.

■ In Claim 1(k), Albanese urges that Kelly provided ineffective assistance of counsel by failing "to request individual voir dire of potential jurors and separation of individual, potential jurors, during the voir dire process." The court need not analyze the first part of this claim under *Strickland* because it is contradicted by the record. Potential jurors *were* questioned separately in voir dire. Judge Cowlin explained jury selection procedures to the venire in the McHenry County trial as follows: "we will call fifteen jurors up and then begin the selection process.... One [venireperson] will be in here in the courtroom with us and then the other fourteen will be in Room 428 and as you know, we are going to take one at a time." (McHenry R. vol. XXVII at 619). A similar procedure was followed in the Lake County trial. Judge Inglis explained, "Now, the first juror we called will report to Courtroom 304.... The next fourteen jurors will report to the jury deliberation room." (Lake R. vol. 4 at 226). As to the second part of Claim 1(k), the court rejects out of hand the notion that failure to request separation of individual potential jurors during voir dire constitutes deficient performance of counsel under *Strickland.*

Claim 1(*l*) is also partially contradicted by the record. Albanese asserts that Kelly "[f]ailed to file any pretrial motions to declare the Illinois Death Penalty Statute unconstitutional because of the unbridled discretion it places in the prosecutors." To the contrary, Kelly did file a pretrial motion in the McHenry trial to have the Illinois Death

---

defendant's trial attorney was ill-prepared for trial; that he prepared for trial in less than one month; that he did not speak to enough or the right expert witnesses; that he did not properly cross examine the State's witnesses; that he failed to reasonably investigate the toxicology reports or the lab that performed the tests;

that he failed to rebut certain of the State's evidence regarding the date of delivery of arsenic to the defendant; and that the failed to accurately present the defendant's financial condition.
125 Ill.Dec. at 840, 531 N.E.2d at 19.

Penalty Statute declared unconstitutional, albeit on the more general grounds that the statute violated the due process and equal protection clauses. (McHenry Common Law R. vol. 2 at 483–84). This motion was denied.

▮▮▮▮▮▮ Albanese does not present any argument, factual or legal, to support his claim that failure to file such pretrial motions constituted deficient representation. To satisfy his burden, Albanese must show that in failing to file a motion in the Lake case to invalidate the Death Penalty Statute, Kelly's representation fell below an objective standard of reasonableness. *See United States v. Donaldson,* 978 F.2d at 394. This he has not done; Claim 1(*l*) cannot operate to relieve Albanese of his sentence.[24] The court notes as a matter of law that statutes are presumed to be constitutional and it can hardly be required that counsel routinely challenge this presumption, regardless of the seriousness of the issue, unless the unconstitutionality of the statute in question is truly manifest.

After careful consideration of the record in light of all of Albanese's ineffective assistance of counsel claims, singly and in combination, the court concludes that Kelly's performance was not constitutionally deficient and did not prejudice Albanese's rights. Accordingly, habeas corpus relief on that basis is denied.

### II. Trial Court Error.

#### A. Witherspoon v. Illinois.

▮▮▮▮ In Claim 2, Albanese asserts that the trial court erred "in allowing death penalty qualification of the jury that was to decide the guilt phase of the trial." [25] This claim is based on research purporting to show that "*Witherspoon*ed" juries are conviction prone.

In light of the long line of cases upholding the propriety of conducting a *Witherspoon*

inquiry in voir dire, Albanese would have had to muster considerable support for this claim to have a hope of success. *See Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Instead, Albanese has offered a cursory and patently meritless argument. Citing *Grigsby v. Mabry,* 483 F.Supp. 1372 (E.D.Ark.1980), Albanese urges "research has now conclusively demonstrated that juries which are death qualified pursuant to *Witherspoon* are not impartial as guaranteed by the Sixth and Fourteenth Amendments." (Petitioner's Resp. to Mot. to Deny Pet. at 19). Albanese fails to recount the convoluted history of the *Grigsby* case, including the fact that when the Supreme Court considered the case, it rejected the very evidence which the district court had accepted. The court now remedies that omission.

In the case cited by Albanese, the district court determined that an evidentiary hearing should be held on petitioner Grigsby's claim that he could present studies showing that death qualified juries are conviction prone. 483 F.Supp. at 1390. That hearing was held in July 1983. *Grigsby v. Mabry,* 569 F.Supp. 1273, 1277 (E.D.Ark.1983). In the meantime, Grigsby's case had been consolidated with that of two other habeas petitioners who had raised the same claim of error: Ardia McCree and Dewayne Hulsey. *Id.* at 1275. The plot thickens. Before the evidentiary hearing was held, Hulsey's claim was found to be procedurally defaulted and Grigsby died in his cell. *Id.* at 1276–77, n. 2. The district court concluded, on the basis of numerous social science studies, that the practice of *Witherspoon* death qualification pro-

---

24. Even if Claim 1(1) could satisfy the performance prong of the *Strickland* inquiry, it would not survive the prejudice prong. In *Silagy v. Peters,* 905 F.2d 986, 993–94 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), the Seventh Circuit held that the discretion vested in the prosecutor by the Illinois Death Penalty Statute did not violate the due process clause or the Eighth Amendment prohibition against cruel and unusual punishment.

25. Death qualification of a jury occurs when prospective jurors are excluded for cause because their views on capital punishment would prevent or substantially impair the performance of their duties as jurors. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) established guidelines, which have been modified over time, governing the prosecution's removal of prospective jurors opposed to the death penalty.

duces conviction prone juries in violation of both the fair-cross-section and impartiality requirements of the Sixth and Fourteenth Amendments. *Id.* at 1323–24. A divided appellate court affirmed. *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985) (en banc).

The Supreme Court reversed, after considering in detail the social science studies relied on in the lower courts. *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Court cited "serious flaws" in the studies, noting that some were only "marginally relevant" and that there were "serious doubts about the value of these studies in predicting the behavior of actual jurors." *Id.* at 168–73, 106 S.Ct. at 1762–64. The Court went on to hold that, even assuming the methodology of the studies to be valid and to establish the proposition that death qualified juries are more conviction prone than non-death-qualified juries, "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." *Id.* at 173, 106 S.Ct. at 1764. In light of *McCree,* Albanese's assertion that the trial courts erred in death qualifying the juries which convicted him is rejected.

### B. Admission of Expert Testimony.

■ In Claim 3, Albanese asserts that the trial court erred "in allowing Rudolph Schaefer to give an opinion as to the financial condition of Petitioner, as opposed to merely allowing him to summarize the financial evidence that had been presented." In his Petition, Albanese identifies this claim as one which was rejected by the Illinois Supreme Court in *Albanese I.* Because this claim is based on alleged state evidentiary error and presents no constitutional issue, it is not cognizable in this court. *White v. Peters,* 990 F.2d 338 (7th Cir.1993).

The Court's discussion of this claim in *Albanese I* confirms that Albanese's challenge to Schaefer's testimony is solely a matter of state law.

[Albanese] maintains that the trial court erred in allowing Rudolph Schaefer, an accountant called as an expert witness by the State, to give an opinion concerning the financial condition of Charles Albanese prior to the deaths of his family members. Schaefer reviewed voluminous mortgage papers, bank deposit slips, and cancelled checks from 1979 to 1981. Schaefer presented his findings to the jury with the aid of charts and testified that Charles Albanese had been in "critical financial condition." Defense counsel objected to this opinion, but the objection was overruled.

*Albanese I,* 79 Ill.Dec. at 617, 464 N.E.2d at 215. The Court went on to decide that it was proper under the Illinois law of evidence for Schaefer to give his opinion, and that the province of the factfinder had not been invaded. *Id.,* 79 Ill.Dec. at 617–18, 464 N.E.2d at 215–16. In his brief on direct appeal of the McHenry conviction, Albanese argued that the allowance of Schaefer's opinion denied him a "fair trial," and that the "ruling of the trial court went well beyond the established Illinois law on the admissibility [of] opinion evidence and should be reversed." (Petitioner's Br. in McHenry Appeal at pp. 82–85). The bare reference to "fair trial" is insufficient to alert the state court to the presence of a constitutional issue, *Verdin,* 972 F.2d at 1475, especially when the remainder of the argument focuses exclusively on state law matters. The "red flag of constitutional breach" was definitely not raised with regard to accountant Schaefer's testimony. *Id.*[26] Claim 3 presents no constitutional issue and is rejected.

### III. Sufficiency of the Evidence.

In Claims 4 and 5, Albanese asserts that his due process rights were violated because the evidence against him was insufficient to support his convictions in the McHenry and Lake County trials. Claim 4 urges generally that the evidence was insufficient for findings of guilt beyond a reasonable doubt, while Claim 5 is directed specifically against the scientific evidence adduced at the trials. The

26. *Verdin* emphasizes a habeas petitioner's obligation to develop constitutional claims in the state courts as a matter of federal-state comity. 972 F.2d at 1473. Vague claims mentioning "fair trial" or "due process" are, therefore, often insufficient to afford state courts an opportunity to correct constitutional violations.

court addresses these claims in reverse order.

## A. Sufficiency of Scientific Evidence

■ In Claim 5, Albanese asserts that "The scientific evidence used against [him] was patently unreliable and inadmissible." This argument is based on the closure of the Toxicology Laboratory in 1985, the various reports about methodological errors at that facility, and the inferences to be drawn therefrom. The closing of the Laboratory and the reports critical of its procedures have been discussed *supra* at 12–15 and 39–41 in the context of Albanese's claims of ineffective assistance of counsel. Some of that background is repeated here for purposes of clarity.

Albanese contends that (1) the methodology employed by chemist Fred Townsend in performing the Gutzeit quantitative test for arsenic was unsound; (2) there were discrepancies in the number of tissue samples taken and the number tested and in the dates of the testing; (3) the Baselt report, issued in 1985, noted the mislabeling of reagent bottles, poorly trained technicians, and the lack of a policy manual at the Toxicology Laboratory; and (4) the Baselt report noted that in another arsenic poisoning case, the Gutzeit tests were incorrectly performed by the Laboratory and neither confirmed nor denied criminal poisoning. (Petition at ¶¶ 38–42). These factors, and the argument that the scientific evidence was unreliable, were presented by Albanese in the post conviction proceeding and have been preserved for review by this court. (Petitioner's Br. in Post Conviction Appeal at 29–30).

Albanese had an opportunity to challenge the Toxicology Laboratory's testing during the three day post conviction hearing held in 1986. Albanese offered into evidence the reports detailing the deficiencies of the Laboratory in general and with regard to the specifics of the Albanese case. These reports were not admitted as substantive evidence, however, because Albanese failed to come forward with witnesses or affidavits to authenticate the reports or vouch for their truth or accuracy. Dr. Poklis, for example, was not produced at the hearing.[27] Even so, the Illinois Supreme Court assumed in its review of the post conviction proceeding that the reports had been admitted and that they were accurate. *Albanese III*, 125 Ill.Dec. at 842, 531 N.E.2d at 21. After reviewing all of the reports, the Court found "no indication or suggestion that the lab was experiencing extensive or grave problems as far back as 1981." *Id.* Indeed, the Court found that the reports indicated that in 1981 the Toxicology Laboratory was functioning well. The court defers to these findings under § 2254(d).

In addition, if the court assumes the validity of the reports offered by Albanese, it must also accept for purposes of argument, the testimony of Dr. Larry Howard which was offered by the State at the post conviction hearing to bolster the reliability of the arsenic tests. This testimony was excluded as irrelevant because Albanese had not offered substantive evidence on toxicology methods. (Post Conviction R. vol. 11 at 288). Dr. Howard, Director of Forensic Sciences for the Georgia Bureau of Investigation, reviewed autopsy reports on Mary Lambert, Marion Mueller, and M.J. Albanese and the trial testimony of the prosecution's scientific expert witnesses in preparation for the post conviction hearing. He testified that the Gutzeit method is an accepted means of arsenic quantitation. Further, Dr. Howard opined that the three victims died of arsenic poisoning, and that Michael Albanese's illness was caused by arsenic. He stated his disagreement with the conclusion of Dr. Poklis. that the Toxicology Laboratory tests were not useful and had not been correctly run. (Post Conviction R. vol. VIII at 325–58).

Albanese has not demonstrated a linkage between the documented and serious failings of the Laboratory in 1985 and the alleged methodological problems with the tests performed on tissue samples of Lambert, Muel-

---

27. Albanese submitted an affidavit by Dr. Poklis together with the Supplemental Petition for habeas corpus. The affidavit restates the conclusions contained in the Poklis report which was offered at the post conviction hearing. The information is not "new" evidence under *United States ex rel. Shore v. O'Leary*, 833 F.2d 663, 669 (7th Cir.1987), and, accordingly, it will not be considered here.

ler, and M.J. in 1981. In the absence of such a link, relief cannot be granted on Claim 5.

### B. Overall Sufficiency of Evidence.

██ Albanese broadens the inquiry in Claim 4, asserting that he "was not proved guilty beyond a reasonable doubt." The standard for judging sufficiency of the evidence claims is well known: after viewing the evidence in the light most favorable to the prosecution, could any rational trier of fact have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The Seventh Circuit, citing *Jackson*, asks "whether any sensible person could find, beyond a reasonable doubt, that the defendant committed the crime." *United States v. Brigham*, 977 F.2d 317, 319 (7th Cir.1992). Where the record supports conflicting inferences, this court must presume, even if it does not affirmatively appear in the record, that the juries resolved those conflicts in favor of the State. *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2792.

██ The facts as summarized by the Illinois Supreme Court at the outset of this opinion illustrate that the evidence against Albanese was circumstantial and powerful. Circumstantial evidence is just as relevant as direct evidence in establishing guilt or innocence. *United States v. Anagnostou*, 974 F.2d 939, 944 (7th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993) and cases cited therein; *see also Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) (applying *Jackson v. Virginia* standard to evidence in a circumstantial case of murder), *cert denied*, 490 U.S. 1008, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989). Taken together, the evidence adduced at trial was sufficient for a rational jury to find guilt beyond a reasonable doubt.

The evidence presented at the trials established that Albanese had motive and opportunity to commit the crimes charged. In August 1980 he was behind on his mortgage, loan, and child support payments; these debts were paid off with his wife's inheritances from Lambert and Mueller. The court must accept the testimony of Donald Fishbein and conclude that M.J. wanted to fire Albanese from the company, and eventually demoted him in September 1980. M.J.'s death and Michael's disability left Albanese in control of Allied Die Casting where he used his position to sell company assets for personal gain. The evidence showed that Albanese had access to all four victims. Mueller and Lambert were visitors to the Albanese home; M.J. and Michael came into frequent contact with Albanese at the offices of Allied·Die Casting.

There was also ample evidence from which the jury could have found consciousness of guilt. The jury in the McHenry County trial, this court must presume, accepted Marty Nathan's testimony that Albanese was trying to frame his brother Michael for the murders; it clearly did not accept Albanese's explanation that he was just trying to prod the police to investigate. Similarly, the court presumes that the Lake County jury credited the testimony of John Saltz and determined that Albanese's schemes to have his brother murdered showed consciousness of guilt.

Due to Albanese's failure to prove that the quantitative tests for arsenic performed by the Toxicology Laboratory were unreliable, the court could simply restate the results showing high concentrations of poison in the tissues of the victims. Even if the Toxicology Laboratory's results are omitted, however, there was sufficient evidence to allow a jury to find that the victims died of arsenic poisoning. Against a background including the facts that Albanese was in possession of a substantial amount of arsenic before August 1980 and that he had access to all of the victims, the jury could have rationally relied on the following facts: (1) the treating physicians testified that the symptoms of the victims were consistent with arsenic poisoning;[28] (2) a sample of M.J.'s blood sent to a

---

28. Dr. Baxamusa testified that all of Mary Lambert's symptoms were consistent with arsenic poisoning and that none of them were inconsistent with that diagnosis. (McHenry R. vol. XXX at 426–27; Lake R. vol. IX at 1145). Dr. Pinto testified to the same effect as to Marion Mueller. (McHenry R. vol. XXX at 440–41; Lake R. vol. IX at 1133). In the McHenry trial, Dr. Bernard Miller testified that Michael and M.J.'s symptoms were consistent with arsenic poisoning and that

California laboratory for testing showed a "very high level of arsenic in the blood"; [29] (3) Dr. Frank Carter, one of Michael's treating physicians, made a diagnosis of "acute arsenic poisoning" based, in part, on the results of a heavy metal analysis of a sample of Michael's hair; [30] and (4) Dr. Helen Young noted the presence of kereses on the hands of Lambert and Mueller, a phenomenon consistent with arsenic poisoning.[31]

Finally, there is the matter of the qualitative tests for arsenic performed by on tissue samples by the Crime Laboratory. X-ray fluorescence was used to analyze the samples. The jury was entitled to conclude from the testimony that the victims had higher than normal quantities of arsenic in their bodies. The jury heard testimony that arsenic is an element present in every person naturally.[32] Then they heard testimony that the Crime Laboratory found *no* arsenic in hair and nail samples taken from Charles Albanese (McHenry R. vol. XXXIII at 97; Lake R. vol. 9 at 1276) and from employees of Allied Die Casting (McHenry R. vol. XXXIII at 87–90). In contrast, arsenic was detected in tissue samples of Lambert and Mueller. (McHenry R. vol. XXXIII at 82–83, 108–09; Lake R. vol. 9 at 1276). From this juxtaposition of results, the jury could have rationally concluded that even the "qualitative" method of x-ray fluorescence had a sensitivity floor, below which no arsenic was measured, such that a positive result had some quantitative meaning. In fact, one witness testified to that effect:

> It is [widely employed], but it is not quantitative. It's only semi-quantitative. By that I mean you can get a good estimate of the amount. You can tell where there is a

lot or a little or some medium quantity, but you cannot specifically determine the exact quantity.

(McHenry R. vol. XXXII at 87) (Joerg Pirl of the Toxicololy Laboratory).

In sum, there was sufficient evidence of motive, opportunity, cause of death, and consciousness of guilt for the jury to have convicted Charles Albanese of the murders of Mary Lambert, Marion Mueller, M.J. Albanese, and the attempted murder of Michael Albanese. *See Anagnostou,* 974 F.2d at 944–45 (where defendant was charged with using an explosive device to destroy his restaurant for insurance proceeds, proof of motive and opportunity, together with circumstantial evidence linking defendant to the explosion and expert opinion that the explosion was not accidental was sufficient evidence to satisfy *Jackson* standard). Under the standard set forth in *Jackson v. Virginia,* relief based on Claim 4 is denied.

### IV. Prosecutorial Misconduct.

In Claims 6 through 12, Albanese contends that, not only was the evidence against him unreliable, but that the State knew it to be so. The State, he argues, withheld potentially exculpatory information from him, and solicited or allowed false evidence to be used against him. Because neither of these theories of constitutional violation were presented to the Illinois courts, they have been procedurally defaulted.

### A. Violation of Brady v. Maryland.

In Claim 6 Albanese asserts that the State of Illinois violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) [33] because it "knew or should have

---

none were inconsistent. (McHenry R. vol. XXX at 479).

29. There was no testimony vouching for the accuracy of this test result. (McHenry R. vol. XXX at 462–64, 480).

30. Again, no witness was produced to vouch for the accuracy of this test. The hair sample was sent to Northwest Community Hospital and then forwarded to a reference laboratory not identified in the testimony. (McHenry R. vol. XXX at 505, 509).

31. Dr. Young determined that the lesions were caused by seborrheic keratoses, a skin condition

stimulated by arsenic. (McHenry R. vol. XXXII at 188–89, 200–01). In her testimony at the Lake County trial, Dr. Young noted the presence of skin lesions on the bodies of Lambert and Mueller, but did not mention that arsenic could aggravate the condition. (Lake R. vol. 9 at 1253, 1262).

32. (Lake R. vol. 9 at 1164; McHenry R. vol. XXX at 372).

33. *Brady* established the principle that suppression by the prosecution of evidence favorable to an accused who has requested it violates due process where the evidence is material either to

known of the gross inadequacy of the Toxicology Laboratory" and did not provide this information to Albanese. No claim that the State violated *Brady* was raised in the Illinois courts. "Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claim on the merits." *Keeney v. Tamayo–Reyes,* —— U.S. ——, ——, 112 S.Ct. 1715, 1720, 118 L.Ed.2d 318 (1992). In his challenge to the scientific evidence at the post conviction hearing, Albanese claimed that the evidence was unreliable and that Kelly's failure to discover the "problems" constituted ineffective assistance of counsel. (Petitioner's Br. in Post Conviction Appeal at 18–26, 29–31). The transcripts from the hearing and the briefs on appeal are devoid of any asseveration that the State suppressed potentially exculpatory information contrary to the requirements of *Brady.*

■■■■ Under the principles outlined in *Verdin v. O'Leary,* 972 F.2d 1467 (7th Cir. 1992), Claim 6 has been procedurally defaulted due to Albanese's failure to fairly present the issue to the Illinois courts. In order to be fairly presented, both the operative facts and the controlling legal principles must be submitted to the reviewing court. *Picard v. Connor,* 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971). Although Albanese presented reports regarding poor conditions at the Toxicology Laboratory at the post conviction hearing and on appeal, he did so in the context of claims of (1) ineffective assistance of counsel and (2) sufficiency of the evidence. The controlling principles of *Brady* and its progeny were not provided. Relief on Claim 6 is, therefore, foreclosed.

### B. Use of False or Perjurious Evidence.

All of the claims in this category, numbers 7 through 12, were presented in Albanese's Supplemental Petition for Writ of Habeas Corpus. In an affidavit filed with the Supplemental Petition Albanese asserts that "since becoming incarcerated in 1982, I have obtained additional documents ... which support the allegations in my Supplemental Petition." With the exception of Claim 12, all of the supplemental claims are premised on the theory that the prosecution "stacked the deck" against Albanese by encouraging perjury or by passively allowing the presentation of evidence it knew to be untrue, with the result that the evidence against Albanese was unreliable. Claim 12 recites a specific example of such unreliability.

■■■ In Claims 7 and 8, Albanese recounts specific errors which allegedly occurred in the testing of tissue samples at the Laboratory.[34] Because the State knew of these errors at the time of the trials, Albanese argues, his convictions "were obtained based on perjury or other patently false evidence." Each claim consists of two parts: unreliability of evidence and the State's alleged knowing use of perjurious testimony. Neither aspect was presented to the Illinois courts in precisely the terms of the Petition. Albanese asserted the general unreliability of the scientific evidence at his post conviction hearing, but the attack was based on the

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

**34.** Claim 7 attacks Fred Townsend's testimony regarding when he tested tissue samples of Marion Mueller:

Testimony of Fred Townsend, State's Chemist who performed tests which were indispensable foundation for opinions as to cause of death, that he performed tests on body tissue samples of Marion Mueller that he received on May 29, 1981. Evidence now available to Defendant reveals Marion Mueller's body tissue samples were not available until August, 1981. All of this evidence was within the knowledge and control of the State.

Claim 8 attacks Townsend's testimony regarding the number of tests performed on tissue samples of M.J.:

Testimony of Fred Townsend that he only performed two sets of tests on tissue samples of M.J. Albanese, on in May 1981 and one in September, 1981. Documents now available to Defendant reveal Townsend performed a third series of tests in June, yielding results that directly contradict the results of the May and September tests. Said contradictions raise a reasonable doubt as to the cause of death of M.J. Albanese. All of said documents were within the control of the State.

Baselt, Fitzpatrick, and Poklis reports and on the closing of the Toxicology Laboratory (Petitioner's Br. in Post Conviction Appeal at 29–31). The specific details of when samples were taken from Marion Mueller's body and how many tests were performed with respect to M.J. were not recounted.

Bearing in mind that in general, "the Constitution has little to say about rules of evidence," *Gacy v. Welborn,* 994 F.2d 305, 316 (7th Cir.1993), this court finds that Albanese has procedurally defaulted the unreliability aspect of Claims 7 and 8. The requirement in habeas corpus cases that all claims of error must be presented first to the state courts would be rendered meaningless if a petitioner could preserve all specific claims of evidentiary error merely by asserting generally in state court that the evidence was insufficient or unreliable. Albanese cannot present generalized claims to the Illinois courts and save specific ones for this court, unless he can show cause for the default, and actual prejudice suffered under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Albanese may be trying to establish cause for his default based on newly discovered evidence by stating that the Supplemental Petition is supported by documents acquired "since becoming incarcerated" and by "documents now available." Unfortunately, Albanese has not demonstrated that any of the documents attached to his Supplemental Petition are truly "new."

> "[N]ewly discovered evidence" has a well-settled meaning; it is evidence which could not reasonably have been presented by the petitioner in the earlier proceeding.... By definition such evidence existed at an earlier time; thus, one must inquire "whether the petitioner *reasonably* either did not know about it or could not have presented it at an earlier proceeding."

*United States ex rel. Shore v. O'Leary,* 833 F.2d 663, 669 (7th Cir.1987) (citations omitted). Albanese claims only that the documents he relies on were obtained by him "since 1982." (Albanese Affidavit at ¶ 2). The relevant time period for determining whether the documents are "new" is much narrower; the Illinois Supreme Court ruled on Albanese's post conviction petition on September 29, 1988 and denied rehearing in December of that year. Only if Albanese could demonstrate that he could not reasonably have presented these documents to the state courts before the end of 1988 would they qualify as "newly discovered." Albanese has provided no details about his acquisition of the documents; it is impossible to determine from Albanese's filings before this court when he obtained them, and certainly there has been no showing that the documents about the Toxicology Laboratory tests could not have been discovered prior to 1989. No other possible basis for showing cause under *Wainwright* being discernable, the court finds the "unreliability" aspect of Claims 7 and 8 to be procedurally defaulted.

■ What remains is Albanese's assertion that his due process rights were violated by the prosecution's knowing use of false evidence and perjured testimony in securing his convictions. Albanese cites *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) in support of this claim. In *Napue,* a prosecution witness serving a 199-year sentence for the same crime (murder) with which the defendant Napue was charged, was asked by the Assistant State's Attorney "Have I promised you that I would recommend any reduction of sentence to anybody?" *Id.* at 271, 79 S.Ct. at 1178. The witness responded that no such promise had been made. In fact, the Assistant State's Attorney *had* promised to seek a reduction in sentence for the witness in exchange for his testimony against Napue and, therefore, knew the witness' answer to be false when it was given. *Id.* Evidence of the Assistant's knowledge was presented in the form a writ of error *coram nobis* which he filed urging a reduction in sentence for the witness, and reciting that the Assistant had promised the witness this effort in order to secure his testimony against Napue. *Id.* at 266, n. 1, 79 S.Ct. at 1175, n. 1. The Supreme Court reversed the conviction, stating "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not solicit-

ing false evidence, allows it to go uncorrected when it appears." *Id.* at 269, 79 S.Ct. at 1177 (citations omitted).

Albanese has attacked the testing performed by the Laboratory, but at no point during the six years during which his cases were before the Illinois courts did Albanese assert that the prosecution knowingly used false toxicology evidence against him. Therefore, no state court was afforded the opportunity to weigh whatever evidence Albanese could muster to support this claim in light of the due process principles identified in *Napue* and its progeny. Due process claims in particular must be carefully identified to the state courts reviewing criminal convictions. *Verdin v. O'Leary*, 972 F.2d at 1475 ("with respect to due process claims, the contours of the possible constitutional claims are, of course, particularly indistinct.... [T]here is a special danger that a claim in state court 'may well present the echo of a federal claim,' while still not alerting the state court to the federal nature of the claim.") (citation omitted).[35] Because the particular due process claim that the state knowingly used false evidence or perjured testimony was not presented to the state courts, it cannot be urged for the first time in this court. Insofar as Claims 7 and 8 are based on that theory, they are procedurally defaulted.[36]

■■■ By Albanese's own assertion, Claim 12[37] regarding the chain of custody of certain tissue samples "is essentially a recitation of additional factual information which supports the inherent unreliability and patent falsity of the scientific evidence which was the foundational information without which this conviction could never have been achieved." (Petitioner's Resp. to Resp. to Supplemental Pet. at 14–15). This court will not consider a chain of custody argument raised here for the first time.[38] Whether the second set of tests performed on tissue samples from Marion Mueller should have been admitted into evidence is a question of state law, not cognizable here. *See White v. Peters*, 990 F.2d 338 (7th Cir.1993); *Gacy v. Welborn*, 994 F.2d 305 (7th Cir.1993).

In Claim 9, Albanese attacks once again the evidence of his financial situation pre-

**35.** That his general challenge to the reliability of the evidence did not present the issue of knowing use of false evidence is borne out by the nature of the analysis actually performed by the Illinois Supreme Court. The Court assumed that the tests were unreliable and asked whether that fact would warrant a new trial. *Albanese III*, 125 Ill.Dec. at 842–43, 531 N.E.2d at 21–22. Faced with a claim based on *Napue*, the Court would have had to focus, instead, on what the prosecution knew about the accuracy of the test results before and at the time of trial. .

**36.** Even if this court's review were not foreclosed, Albanese would have great difficulty in obtaining an evidentiary hearing on the issue of prosecutorial misconduct. First, he has presented no facts to support the allegations of prosecutorial misconduct. *Holleman v. United States*, 721 F.2d 1136, 1138 (7th Cir.1983) ("To establish a prima facie case that a conviction should be vacated because obtained through the use of perjured testimony, a petitioner must show that the testimony was in fact false and the government used it with actual or constructive knowledge of the falsity"). Second, Albanese would have to show cause for his failure to develop such facts and actual prejudice resulting from the failure. *Keeney v. Tamayo–Reyes*, —— U.S. at ——, ——, 112 S.Ct. at 1719, 1721; *Cornell v. Nix*, 976 F.2d 376, 380 (8th Cir.1992) (en banc) (habeas petitioner must show cause and preju-

dice to excuse failure to develop a material fact in state court proceedings).

**37.** Claim 12 reads in full:

The scientific evidence presented to convict Charles Albanese was otherwise unreliable in one or more of the following ways:

Townsend testified to results of test performed on the tissue samples of Marion Mueller that he received in May 1981. He also testified to a second series of tests performed on the second set of tissue samples, which yielded identical results as the first. The whereabouts of this second set of tissue samples is unaccounted for for a 15 day period, according to the testimony as to its chain of custody. Additionally, it appears that the second set of tissue samples arrived in two separate shipments, 15 days apart. One package arrived under the coroner's seal and identified as such. Fifteen days later a second package arrived at the Toxicology Laboratory without the coroner's seal or any other marking to account for its chain of custody. No explanation was ever offered as to how and why the tissue samples became separated. Evidence handled in such a fashion is patently unreliable.

**38.** Albanese's overall claim that the evidence presented at his trials was insufficient to support his convictions is considered in claim 4.

**554**

sented by the State.[39] The State's theory posited that Albanese committed the murders of Mueller, Lambert, and M.J. for financial gain, and that his financial situation was quite dire immediately prior to the first two murders. *Albanese I*, 79 Ill.Dec. at 610, 464 N.E.2d at 208. In his appeal of his Lake County conviction, Albanese disputed the accuracy of the State's financial presentation. *Albanese II*, 85 Ill.Dec. at 444, 473 N.E.2d at 1249; (Petitioner's Supplemental Br. and Appendix in Lake Appeal).

Albanese now reprises the financial argument which was considered and rejected in *Albanese II*. Because the factual foundation for this argument is the same now as it was when presented to the Illinois Supreme Court, that court's factual findings are accepted under § 2254(d). Insofar as Albanese's assertions regarding the State's *motivation* in presenting financial evidence differ from those raised on direct appeal, the claim is rejected for failure to present the matter to the state courts.

Albanese argues that the picture of his financial health (or lack thereof) presented at his trials was inaccurate due to omissions in income and overstatement of expenses. The State's expert accountant, Rudolph Schaefer, testified that in August 1980 Albanese was in a "very critical financial condition ... evidenced by an acute shortage of cash." *Albanese II*, 85 Ill.Dec. at 446, 473 N.E.2d at 1251. Every omission in income is significant, argues Albanese, because the less dire his financial condition, the less motive to murder family members for inheritances.

The account summaries, copies of checks and deposit slips submitted with the Supplemental Petition to document discrepancies in the evidence are not new. Albanese argues to this court that $10,590 was shown as an

expense in the State's evidence when, in fact, it was a transfer between accounts. This precise point, down to the dollar figure, was urged upon the Illinois Supreme Court in the Lake County appeal. (Petitioner's Supplemental Br. in Lake Appeal at 4). Similarly, Albanese's current reference to $1,700 in double counted withdrawals merely echoes the claim made nine years ago. (*Id.* at 4–5). The list Albanese submitted in the Lake appeal of small deposits which were unaccounted for in the State's evidence is substantially similar to the list presented to this court. On both lists, for example, the following deposits are shown for 1980: February 19—$49.50; May 17—$487.47; June 27—$42.55; September 20—$72.00. (Handwritten attachment to Supplemental Petition; Lake Supplemental Br. at 2–3). Many additional duplications could be enumerated, but the bottom line is that Albanese submitted to the state Court substantially the same calculations about the State's alleged errors as he submits here.

When faced with that claim, the Illinois Court determined that the facts presented at trial did not materially misstate Albanese's monetary situation. *Albanese II*, 85 Ill.Dec. at 444, 473 N.E.2d at 1249 ("'[Petitioner's] revisions do not detract in any way from the State's evidence summarizing defendant's obligations and arrears in the critical months of July and August of 1980"); *supra* at 34–37 (discussion of financial evidence in the context of ineffective assistance of counsel Claims 1(d) and 1(e)). Finding no reason to dispute this analysis of Albanese's presentation of alleged errors in the State's evidence, this court defers to the finding of the Illinois Court under § 2254(d).

Indeed, there are several reasons other than § 2254(d) to accept the finding. First,

**39.** Claim 9 states: "Financial exhibits prepared by the State or at the direction and control of the State, intentionally omitted substantial amounts of income (1980—$21,263.13, 1981—$46,800.00) and misreported expenses (1980—$23,063.09, 1981—$5,797.93) to create a grossly distorted ($96,924.15 net distortion) picture of Charles Albanese's true financial health. The 1980 misreported expenses break down as follows:
—$10,590.00 transferred from one checking account to another and shown as an expense each time;

—$1,700.00 drawn in cash from account and deposited in another, and shown as an expense each time;
—$10,773.09 used to pay funeral expenses of Marion Mueller. (This was not an expense of Charles Albanese that would create a motive for murder, but was handled as such by the State's witness.) It is rather an expense paid by Charles Albanese (or his wife) which was created by the death of which he was accused."

the Illinois Court had a second chance to review the evidence in *Albanese III*, where Albanese argued that attorney Kelly was ineffective for failing to point out discrepancies in the State's financial exhibits. Once again the Court found the alleged errors to be immaterial: "there is no dispute that as a result of the deaths the defendant experienced financial gains that eased a financially tight situation, and moving numbers from one side of the ledger to another could not have altered that fact." *Albanese III*, 125 Ill.Dec. at 841, 531 N.E.2d at 20. Second, Albanese has never put forth credible evidence seriously challenging the precariousness of his financial condition. At the post conviction hearing, where Albanese's accounting expert, Terry Hall, stated that Albanese was in "terrific" financial condition, the judge dismissed her testimony as unpersuasive. (Post Conviction R. vol. II at 285). Finally, there can be no reason for this court to revisit an issue satisfactorily resolved in the state courts where Albanese had access to all of the underlying financial documentation in advance of his trials. Although Albanese has presented this argument in a Supplemental Petition together with claims based on purportedly "new" information, any inference that the financial claim is supported by new evidence must be rejected. In his post conviction appeal, in the context of an ineffectiveness argument, Albanese asserted "there is clearly evidence, available pretrial, which proves that Charles and Virginia Albanese were financially stable." (Petitioner's Br. in Post Conviction Appeal at 23). Terry Hall based her opinion exclusively on records available at trial; additionally, she found Albanese himself to be well-acquainted with his business affairs. (Post Conviction R. vol. VIII at 275–76).

The only "new" allegation contained in Claim 9 is that the State intentionally misstated Petitioner's financial status. Albanese equivocates over what exactly the State is accused of doing. First he asserts that "this claim is that the State solicited or allowed perjured testimony to stand in support of the conviction." (Petitioner's Resp. to Resp. to Supplemental Pet. at 8). Later, the onus is shifted to Schaefer: "the testimony of Rudolph Schaeffer [sic] is alleged herein to be false because *he* intentionally omitted income or because the State withheld those records from him, thus invalidating his analysis." (*Id.* at 11) (emphasis added). Through these allegations, Albanese seems to be relying on a *Napue*-type theory. As discussed above, however, Albanese never asserted that theory in the state courts and so never produced any evidence of withholding of records or of solicitation to give false testimony. Instead, Albanese bases this claim on bare assertions. For the reasons stated *supra* at 64–66, the solicitation of false evidence/allowing false evidence to be introduced aspect of Claim 9 is procedurally defaulted for failure to present the issue to the state courts.

The same fate befalls Claims 10 and 11, also based on *Napue v. Illinois*.[40] As Albanese himself makes plain, he is not asserting that the State violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) with regard to the medical records of Albanese's brother Michael: "It is not now, nor has it ever been alleged, that the State withheld the hospital records that would have proven the patent falsity of Michael Albanese, Jr.'s testimony." (Petitioner's Mem. in

---

40.
 Claim 10:
 Michael Albanese, Jr. testified that on September 8, 1980, November 14, 1980, January 6, 1981, February 4, 1981 and February 27, 1981 he was hospitalized with vomiting and other symptoms consistent with, arsenic poisoning (McH R Vol. XIV, p. 24, 25, 30–36, 38, 29). The state argued that this was part of Charles' scheme to get control of the family business. The State had in its control hospital records that showed Michael's hospital admissions were for reasons completely unrelated to arsenic poisoning and that directly contradict his claims of vomiting.

 Claim 11:
 The State called Joseph Reichel to testify that he provided Charles Albanese with a quantity of arsenic in "late 1979." (McH R Vol. XVIII, p. 325, Lake R., p. 1363). The State had police reports and a taped interview of Joseph Reichel in its possession which revealed that he gave the arsenic to Charles Albanese in May or June of 1980. This information corroborates Petitioner's explanation that he wanted the arsenic to eliminate a rodent or pest problem in his neighborhood. (Neighbors of Charles Albanese did testify to the magnitude of the pest problem in their neighborhood in the late Spring of 1980).

Sup. of Supplemental Pet. at 11). Instead, he claims that the State knew Michael's testimony about having been hospitalized for vomiting was false. While in the state courts, Albanese utilized the discrepancy between Michael's testimony and the medical records of his symptoms to argue that attorney Kelly was ineffective for failing to highlight the differences. "Richard Kelly did not impeach the crucial testimony of Michael Albanese. Michael testified that he experienced nausea and stomach problems in September of 1980, when in fact according to hospital records and medical notes, Michael was tested because of severe headaches." (Petitioner's Br. in Post Conviction Appeal at 25). There was no hint in the ineffectiveness argument that the State violated Albanese's due process rights by allowing Michael to testify to feeling nauseous. Albanese cannot preserve a Fourteenth Amendment claim by the roundabout method of asserting a Sixth Amendment challenge to counsel. Nothing in Albanese's argument about Kelly's performance would have "raised the red flag" of a constitutional violation based on *Napue*.[41] *See Verdin v. O'Leary*, 972 F.2d at 1475.

Claim 11 was also presented to the state courts as an ineffective assistance of counsel claim, rather than a due process claim for the State's knowing presentation of false evidence. Joseph Reichel testified that he gave a quantity of arsenic to Albanese in late 1979. (McHenry R. vol. XXX at 315–17). The State *and Albanese* had access to police statements given by Reichel which placed the date of arsenic delivery in the spring of 1980. (Petitioner's Br. in Post Conviction Appeal at 21) (material with which to impeach Reichel was "readily available"). Albanese argued that Kelly's failure to use the police reports to impeach Reichel as to the date of arsenic delivery constituted ineffective assistance.[42] (*Id.*). Once again, Albanese's arguments to the state courts did not ever intimate that

the State, rather than Kelly, was the source of a constitutional violation. Because this claim was never presented to the state courts, review by this court is precluded.

## V. Conclusion.

After careful consideration of Claims 1 through 12, this court has not found that the constitutional rights of Charles Albanese were violated in the guilt phase of either the McHenry or Lake County trial. His convictions, therefore, will not be disturbed. The court now turns to Albanese's claims of constitutional error in the sentencing phases of his trials.

## Part Two: Sentence Claims.

After the McHenry County jury found Albanese guilty, a separate sentencing hearing was conducted in accordance with the procedures set forth in the Illinois death penalty statute, Ill.Rev.Stat. ch. 38, ¶ 9–1(d). The same jury which convicted Albanese sentenced him to death. In the Lake County trial, Albanese waived a jury for sentencing, and the death penalty hearing was conducted before the trial judge, who imposed the death sentence. In Claims 13 through 19, Albanese contests the constitutionality of those two death sentences.

Albanese mounts a facial attack on Illinois death penalty statute (Claims 13(a)–13(f)), as well as on the procedures followed in his particular case. These "as applied" claims are directed solely against the McHenry County sentence. Albanese argues (1) that the prosecutor's closing argument was inflammatory and improperly commented on Albanese's silence (Claims 14, 19), (2) that the process of *Witherspoon*ing produced a jury predisposed to impose the death penalty (Claims 17–18), and (3) that the jury was incorrectly instructed (Claims 15–16).

41. If this court's review were not foreclosed, Albanese would have to present new evidence to support the *Napue* claim. The fact that Michael testified to feeling nauseous while his records spoke of headaches is a far cry from establishing that Albanese's conviction was based, as he claims, on "perjury and other patently false evidence."

42. In closing argument at the Post Conviction hearing, the State posited that, as a matter of strategy, Kelly elected not to use the evidence that Albanese acquired the arsenic in 1980 because the 1979 delivery date removed the element of immediacy between the acquisition of arsenic and the deaths. (Post Conviction R. vol. IX 526).

### I. Facial Attack on Illinois Death Penalty Statute.

The death penalty statutory scheme in Illinois has been upheld repeatedly by both the state and federal courts. *People ex rel. Carey v. Cousins*, 77 Ill.2d 531, 34 Ill.Dec. 137, 397 N.E.2d 809 (1979); *People v. Brownell*, 79 Ill.2d 508, 38 Ill.Dec. 757, 404 N.E.2d 181 (1980); *Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); *Williams v. Chrans*, 945 F.2d 926 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). Albanese, therefore, faces an uphill battle in arguing its unconstitutionality. As is discussed in detail below, Albanese is not equal to this challenge; his claims are either procedurally defaulted or deficient on the merits.

In Claim 13(a), Albanese argues that the death penalty statute is unconstitutional because

> It permits unlimited prosecutorial discretion in seeking the death penalty, violating the doctrine of separation of powers, and a defendant's right to due process of law, resulting in death penalty sentences that are arbitrary and capricious and are imposed in a wanton and freakish manner.

Both of these contentions were rejected in *Silagy v. Peters*. As to the separation of powers argument, *Silagy* notes that a prosecutor's exercise of discretion under the death penalty statute does not amount to a "judicial function." 905 F.2d at 993, n. 5. The prosecutor merely *initiates* the death penalty proceeding, while the jury or judge, as the case may be, determines whether to *impose* the sentence. This fact also defeats Albanese's due process claim, because the prosecutor's election to seek the death penalty does not deprive a defendant of life, liberty or property. *Id.* at 997. Rather, "[t]he deprivation occurs, if at all, only through the action of the judge or jury at the conclusion of the statutorily-mandated sentencing hearing.... [which] provides for all the procedure which is due under the fourteenth amendment." *Id.* Claim 13(a) is rejected.

The State asserts that Albanese's next Claims, 13(b) and 13(c), have been procedurally defaulted because they were never presented to the Illinois courts. These claims are that the death penalty statute is unconstitutional because:

> It fails to provide proper constitutional focus on the individual characteristics of a defendant in having a jury decide the death penalty issue.

and

> It defines as a mitigating factor whether or not a defendant has "no significant history of prior criminal activity," which terms are unconstitutionally vague, indefinite and uncertain.

In response, Albanese argues that these claims were presented to the Illinois Supreme Court on direct appeal from the Lake County trial in the form of the following claim:

> The Illinois Death Penalty Act is unconstitutional because it fails to provide sufficient information gathering procedures to insure adequate appellate review.

(Petitioner's Br. in Lake Appeal at p. 114).

From the cases cited to the Illinois Court in support of this point, it is clear that Albanese based his Lake County claim on the argument that comparative proportionality review is necessary to insure the constitutionality of death sentences, rather than on the current arguments.[43] Comparative proportionality review is a process whereby an appellate court compares a particular defendant's sentence with sentences imposed for similar crimes in order to prevent the imposition of the death penalty in an arbitrary and

---

43. In support of this point, Albanese urged the Illinois Court to reconsider its decisions in the following cases which clearly dealt with comparative proportionality review: *People v. Brownell*, 79 Ill.2d 508, 38 Ill.Dec. 757, 404 N.E.2d 181 (1980) ("defendant argues that the Illinois death penalty statute is defective concerning appellate review because it does not require a comparison by this court of all the cases in which the death sentence is imposed ...") and *People v. Kubat*, 94 Ill.2d 437, 69 Ill.Dec. 30, 60, 447 N.E.2d 247, 277 (1983) ("[d]efendant also urges that the death sentencing 'scheme' is defective because it fails to provide adequate comparative review procedures ..."). In addition, Albanese noted that the United States Supreme Court had granted *certiorari* on "this question" in *Pulley v. Harris*.

disproportionate manner. *See Pulley v. Harris,* 465 U.S. 37, 42–44, 104 S.Ct. 871, 875–76, 79 L.Ed.2d 29 (1984). The cases cited by Albanese in the Lake County appeal discuss neither "constitutional focus on the individual characteristics of a defendant," nor the adequacy of the mitigating factor addressing a defendant's prior criminal history. In attempting to tie his various claims together, Albanese rather inelegantly states "The information gathering procedures required to insure adequate Appellate review are those procedures which provide the focus and direction upon a jury to steer them towards the proper constitutional issues which must be considered in making their decision on the death penalty issue." (Petitioner's Resp. to Mot. to Deny Pet. at 26–27). Seeing no relationship between the Lake County claim and Claims 13(b) and 13(c), Albanese's explanation notwithstanding, the court concludes that the claims have been procedurally defaulted.

Albanese has not attempted to satisfy the cause and prejudice requirements of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Such an effort would be futile in any event. In upholding the Illinois death penalty statute, the *Silagy* court found that it does indeed require the jury to focus on the individual characteristics of the defendant:

> [A] State's imposition of the death penalty does not comport with the guarantees of the eighth amendment unless the sentencing authority considers "the character and record of the individual offender and the circumstances of the particular offense. . . ." The Illinois statute's mandate that the jury (or judge) consider any mitigating and aggravating circumstances regarding the individual defendant and the particular crime serves to ensure that these eighth amendment rights are observed.

*Silagy,* 905 F.2d at 998, quoting *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); *see also Williams v. Chrans,* 945 F.2d at 935–36; *People v. Lewis,* 88 Ill.2d 129, 144–46, 58 Ill.Dec. 895, 430 N.E.2d 1346 (1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73

L.Ed.2d 1308 (1982) (upholding the adequacy of the "no significant history of prior criminal activity" mitigating factor). Albanese cannot obtain relief from his sentences based on Claims 13(b) and 13(c).

In Claim 13(e), Albanese raises the issue of comparative proportionality review in a straightforward manner. The claim fails on the merits. In *Pulley v. Harris,* 465 U.S. at 43–44, 104 S.Ct. at 875–76, the Supreme Court held that the constitution does not invariably require state appellate courts to conduct comparative proportionality review before affirming a death sentence. Instead, such review would only be mandated if the statutory scheme in question did not incorporate other sufficient safeguards against arbitrary imposition of the death penalty. The Illinois death penalty statute is not of that class: It contains adequate mechanisms to guard against arbitrariness, rendering comparative proportionality review unnecessary. *Silagy,* 905 F.2d at 1000 ("we do not believe that the remainder of the Illinois statute is lacking in procedural safeguards so as to mandate the addition of proportionality review . . .").

The State asserts the bar of procedural default as to Claim 13(d) in which Albanese asserts that the death penalty statute is unconstitutional because

> It provides that a jury to impose the death penalty must determine that "no mitigating factors exist sufficient to preclude the opposition [sic] of the death sentence", which such standard is unconstitutionally vague, indefinite, and uncertain.

Albanese argues that this claim has been preserved because it was raised on direct appeal of the McHenry County conviction and sentence in the following terms:

> An instruction which limited the jury's consideration of mitigating factors to whether the Defendant had a significant history of prior criminal activity and whether he might be rehabilitated or restored to useful citizenship denied [Defendant's] rights guaranteed by the eighth and fourteenth amendments.

(Petitioner's Br. in McHenry Appeal at 117). These arguments are directed at different problems. Claim 13(d) attacks a provision of

the statute itself which tells the jury, albeit convolutedly, how to weigh the mitigating factors it has found. The McHenry claim, in contrast, attacks a specific instruction given to the jury which purportedly limited the jury's consideration of mitigating factors in the first place. The former argues that the *standard* for jury consideration, the framework of the statute, is vague; the latter urges that the *specifics* under consideration by the jury were too narrow.

Albanese himself makes the point. He argues now that the statute is "vague, indefinite, and uncertain." In the McHenry appeal, it was his position that "[t]he court's instructions directed the jury to consider mitigating factors and then defined that term in a manner so narrow and restrictive as to violate [his] rights under the Eighth and Fourteenth Amendments." (*Id.* at 119). The argument that the instruction was restrictive and narrow cannot preserve an argument that the instruction is vague and indefinite. Claim 13(d) has been procedurally defaulted. Albanese has not offered any basis for excusing the default by demonstrating cause and prejudice.[44]

■ Albanese's final challenge to the validity of the Illinois death penalty statute is somewhat odd. In Claim 13(f), Albanese states

A majority of the Illinois Supreme Court believed the Illinois Death Penalty Act to be unconstitutional, but have set a judicial doctrine of *stare decisis* above their constitutional judgments.

This claim was not raised in either direct appeal, nor in the post conviction proceeding. Despite this waiver, Illinois Supreme Court Justice Simon raised the issue in his dissent to *Albanese II*, provoking responses from Justice Clark and Chief Justice Ryan. *Albanese II*, 85 Ill.Dec. at 458–65, 473 N.E.2d at 1263–70. Like Albanese, Justice Simon, an opponent of the death penalty, claims that a majority of the Illinois Supreme Court believes the Death Penalty Act to be unconstitutional. *Id.*, 85 Ill.Dec. at 462, 473 N.E.2d

at 1267. This claim is based on the dissent of three members of that Court, Justices Ryan and Clark and Chief Justice Goldenhersch from the decision in *People ex rel. Carey v. Cousins*, 77 Ill.2d 531, 34 Ill.Dec. 137, 397 N.E.2d 809 (1979), upholding the constitutionality of the Illinois statute. Subsequent to the *Carey* decision, Justice Simon joined the court, replacing a member of the majority. Therefore, the argument goes, four of seven current justices oppose the Illinois Death Penalty on constitutional grounds. Having explained the background to Claim 13(f), its lack of merit should be clear. As the special concurrences of Chief Justice Ryan and Justice Clark illustrate, they have acquiesced to *Carey* and they applied the existing law to Albanese's case. *Id.*, 85 Ill.Dec. at 458–61, 473 N.E.2d at 1263–66. The claim that these justices chose to follow precedent articulates no violation of Albanese's constitutional rights.[45]

All of the remaining claims attack the sentence imposed by the McHenry County jury. Albanese does not argue that the Lake County judge who conducted the sentencing hearing misapplied the law. All claims against it having been overruled, the sentence of death imposed in the Lake County trial and affirmed on appeal will not be disturbed by this court.

## II. Prosecutorial Misconduct.

■ In Claim 14, Albanese objects to two portions of the prosecutor's closing argument to the jury during the sentencing phase of the McHenry County trial. First, the prosecutor allegedly made an improper comment on Albanese's right to remain silent by stating:

He denies his guilt. You've seen no repentance. I think that repentance is the first step toward rehabilitation, an acknowledgment of guilt. I'm sorry. He denies that. Can that person be rehabilitated? I submit to you no.

(Petitioner's Resp. to Mot. to Deny Pet. at 30–31; McHenry R. vol. XXXVI at 229).

---

44. In any event, the court would have been compelled to reject claim 13(d) on the merits in light of *Silagy v. Peters*, 905 F.2d at 997–1001 and *Gacy v. Welborn*, 994 F.2d 305 (7th Cir.1993).

45. Opinions do differ on this issue. *See* Margaret S. Hewing, Note *Stare Decisis and the Illinois Death Penalty*, U.Ill.L.Rev. 177 (1986).

The State argues that this claim has been procedurally defaulted because it was presented as a Fifth Amendment claim to the Illinois Supreme Court but is presented here under a heading claiming violation of Sixth and Fourteenth Amendment rights. The court rejects the rather flimsy argument of the State. It is true that Albanese's Petition for Habeas Corpus is headed by a paragraph asserting Sixth and Fourteenth Amendment violations, but he has argued in terms of a Fifth Amendment violation both to this court and to the state court. (Petitioner's Resp. to Mot. to Deny Pet. at 30–32) ("[The prosecutor's] statement infers that at the sentencing hearing, Albanese should give up his right to remain silent and confess remorsefully to avoid the death penalty."). Albanese raised the same issue, specifically citing the Fifth Amendment, on direct appeal (Petitioner's Br. in McHenry Appeal at 129–30), preserving it for review by this court. The claim fails on the merits.

■ This court agrees with the conclusion of the Illinois Supreme Court that the prosecutor's comment was not directed at Albanese's silence. *Albanese I*, 79 Ill.Dec. 608, 621, 464 N.E.2d 206, 219. Rather, the comment concerned only his lack of remorse for crimes of which he had already been convicted; after the jury had found Albanese guilty beyond a reasonable doubt, he was obviously no longer entitled to be presumed innocent. *Herrera v. Collins*, —— U.S. at ——, 113 S.Ct. at 860. A defendant's remorse is a proper subject for consideration during sentencing under both Illinois and federal law. *People v. Morgan*, 59 Ill.2d 276, 319 N.E.2d 764 (1974); *United States v. Saunders*, 973 F.2d 1354, 1362–63 (7th Cir. 1992) (rejecting argument that Sentencing Guideline § 3E1.1 which permits reduction in sentence for "acceptance of responsibility" penalizes defendants for exercising their right to jury trial and their right against self

incrimination), *cert. denied*, —— U.S. ——, 113 S.Ct. 1026 (1993); *see also United States v. Tolson*, 988 F.2d 1494 (7th Cir.1993); *United States v. Goines*, 988 F.2d 750, 776 (7th Cir.1993) (noting trial court's consideration of defendant's "utter lack of remorse" in determining appropriate sentence). The prosecutor's reference to Albanese's lack of remorse was not improper.[46]

■ Albanese's second objection to the argument at sentencing relates to the prosecutor's comments on testimony regarding the percentage of Americans supporting the death penalty. Albanese urges that this was unduly prejudicial, in that it distracted the jury from consideration of Albanese's personal qualities. (Petitioner's Resp. to Mot. to Deny Pet. at 31–32; Petitioner's Br. in McHenry Appeal at 131). The court finds that although the statements of the prosecutor summarized below were improper, no prejudice resulted from the remarks.

Mel Wallace, the Coordinator of Criminal Justice at McHenry County College, was called by the defense at the sentencing hearing. Mr. Wallace testified that based on his review of many studies concerning the death penalty, statistical evidence that the death penalty deters crime or murder was lacking. (McHenry R. vol. XXXVI at 203–06). On cross examination, and without objection, Mr. Wallace volunteered the information that according to a then-recent survey, sixty-two percent, a "substantial majority," of the American public supported the death penalty. (*Id.* at 211). In his argument to the jury, the prosecutor referred to Wallace's testimony: "Mr. Wallace tells us that there are studies opposing the death penalty.... He said not all of them are opposed to the death penalty.... And about 62 percent of the people in the United States today favor the death penalty." (*Id.* at 233).

---

46. In claim 19, Albanese asserts that he "was sentenced to death because he exercised his right to trial by jury." The State argues that the claim was never presented to the state courts. Albanese responds that the Illinois Supreme Court considered the question in its analysis of the prosecutor's comment on his lack of remorse. (Petitioner's Resp. to Mot. to Deny Pet. at 35). This court has already addressed that issue in claim 14. Albanese again argues that the jury sentenced him to death due to references to his lack of remorse and, indeed, refers the court to his prior claim on this issue: "See argument *supra* relevant to the Prosecution's improper comment on his right to remain silent." (*Id.* at 36). Because this claim duplicates claim 14, it will not be addressed further.

Albanese's attorney, Mr. Kelly, had an opportunity to respond. He argued to the jury that the death penalty would not be appropriate. Imposing the death penalty, he said, would not "do society any good..... It has no deterrent effect." (*Id.* at 236). Kelly emphasized his abhorrence of the death penalty: "death by electrocution is not painless. It isn't swift.... it is something to me that is repugnant to a civilized society." (*Id.* at 237). In rebuttal, the prosecutor referred to the statistic provided by Mr. Wallace once again. (*Id.* at 241).

■ These sentencing arguments certainly left something to be desired. Both the prosecutor and Kelly made inappropriate remarks about the death penalty. The prosecutor's comments on the percentage of Americans favoring the death penalty, as well as Kelly's references to his personal opinion about the "repugnance" of capital punishment were improper. The statements, however, in the context of the closing arguments as a whole, were not so inflammatory as to be prejudicial. Relief based on Claim 14 is denied.

### III. Witherspoon v. Illinois.

■ In Claims 17 and 18 [47], Albanese once again attacks the propriety of death qualifying jurors under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), but in a different context than his earlier challenge considered in Claim 2. Claim 2, it will be recalled, asserted that the process of death qualification resulted in a jury more likely to *convict* a defendant. *Supra* at 48–50. The current claims present the position that death qualification produces a jury predisposed to *impose the death pen-*

*alty.* The State contends that these claims of trial court error have been procedurally defaulted; the court agrees as to Claim 17 and disagrees as to 18.

With regard to Claim 17, a little background is helpful. The Illinois death penalty statute provides that the separate sentencing hearing shall be held:

(1) before the jury that determined the defendant's guilt; or

(2) before a jury impanelled for the purpose of the proceeding if ... (C.) the court for good cause shown discharges the jury that determined the defendant's guilt; or

(3) before the court alone if the defendant waives a jury for the separate proceeding.

Ill.Rev.Stat. ch. 38 ¶ 9–1(d). So while Albanese contends that it was error for the McHenry trial judge not to impanel a second jury, the statute makes clear that Albanese was not entitled to a second jury unless he made a showing of good cause. Albanese did not attempt to make any such showing at the trial level. More importantly, Albanese has never argued to the state courts that the lack of a new jury for sentencing violated his constitutional rights; his arguments have been focused on the effects of *Witherspoon*-ing on the jury which was to determine guilt. (Petitioner's Br. in Lake Appeal at 77–81; Petitioner's Br. in McHenry Appeal at 106). Because it was not fairly presented to the state courts, relief based on Claim 17 is denied. [48]

Contrary to the State's assertion regarding Claim 18, Albanese did urge upon the Illinois Supreme Court that *Witherspoon* death qualification produces a jury predisposed to im-

---

**47.** Claim 17:
The trial court erred in not voir diring the jury prior to the death penalty phase and discharging the jury to impanel a second jury because of a predisposition to impose the death penalty, under the provisions of the Death Penalty Act.
 Claim 18:
The trial court erred in death qualifying the jury under principles of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

**48.** Even if the court were to stretch Albanese's state court claims to cover the instant one, Alba-

nese could not make out a constitutional violation. The right to jury for capital sentencing is statutory, rather than constitutional. *See People v. Henderson*, 142 Ill.2d 258, 333, 154 Ill.Dec. 785, 568 N.E.2d 1234, *cert. denied*, — U.S. —, 112 S.Ct. 233, 116 L.Ed.2d 189 (1991); *see also People v. Devin*, 93 Ill.2d 326, 344, 67 Ill.Dec. 63, 444 N.E.2d 102 (1982) (the death penalty statute "presumes that the sentencing hearing will be conducted before the jury that determined guilt" unless good cause is shown for discharge). Moreover, Albanese waived the issue by failing to seek a new jury for sentencing.

pose the death penalty. "[M]ere exposure to the process of death qualification ... convinces people that the law disapproves of opposition to the death penalty and makes the death penalty appear more appropriate than imprisonment." (Petitioner's Lake brief at 81). Surviving the hurdle of procedural default, however, avails Albanese little. As noted *supra* at 48–49, the constitutionality of conducting a *Witherspoon* inquiry has been repeatedly upheld. Albanese has not presented any persuasive authority to the contrary,[49] and Claim 18 is rejected as a basis for relief.

### IV. Jury Instructions.

Albanese challenges two aspects of the jury instructions given at the sentencing phase of the McHenry County trial. First, he claims that the jury was wrongfully instructed on the unanimity needed to decline the death penalty. Second, Albanese contends that the jury should have been instructed that the only alternative to the death sentence was life imprisonment without parole.

### A. Unanimity.

In Claim 15, Albanese asserts that "[t]he jury of the death penalty phase was wrongfully instructed that they were required to unanimously find a mitigating factor to preclude imposition of the death penalty and [sic] direct contradiction of the Illinois Death Penalty Act." The State counters that this claim was never raised in the state courts and has been procedurally defaulted. While it is a very close question, the court determines that the claim has been preserved for review.

On appeal from the McHenry trial, Albanese contended that the jury "should have been instructed that they need not find that a mitigating factor existed beyond a reasonable doubt in order to decide against the death penalty." (Petitioner's Br. in McHenry Appeal at 132). This argument focused on what the jury should have been told about the quantum of proof necessary for it to find a mitigating factor making imposition of the

death penalty inappropriate. (*Id.* at 132–33). The argument did not challenge the jury instructions regarding unanimity. Nonetheless, both the McHenry claim and the current one address instructions regarding the jury's evaluation of mitigating evidence. The State is certainly correct in noting that a general claim that the jury was wrongfully instructed cannot preserve specific attacks, but the claims under consideration here are related, albeit tenuously. Proceeding to the substance of Claim 15, the court finds that it has none.

■ Contrary to Albanese's assertion, the jury was not instructed that unanimity was required in order for it to *decline* to impose the death penalty. The judge's instructions included the following:

If after your deliberations, you are not unanimous in concluding that there is no mitigating factor or factors sufficient to preclude the imposition of the death penalty, sign the verdict form that says no agreement on death penalty.

In this situation you will sign a verdict form stating your finding of one statutory aggravating factor and one verdict form stating that you did not unanimously agree on the absence of a mitigating factor or factors sufficient to preclude the death penalty.

If you sign these forms, the Court must sentence the defendant to imprisonment.

(McHenry R. vol. XXXVI at 248). These instructions correctly stated the law, when combined with others requiring that the jury be unanimous in its conclusion that no mitigating factors were present sufficient to preclude the death penalty in order for the court to sentence the defendant to death. *Compare Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.) (death sentence vacated where jury was incorrectly instructed "If ... you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence. . . . the Court will sentence the defendant to imprisonment"), *cert. denied sub nom., Kubat v.*

---

**49.** Albanese's appellate brief in the Lake County case cites only the overruled case of *Grigsby v. Mabry*, 483 F.Supp. 1372 (E.D.Ark.1980), a Cali- fornia Supreme Court case, and several social science studies from the early 1980's. (Petitioner's Br. in Lake Appeal at 77–81).

*Greer,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989).

■ The court notes that while the instructions given were correct, they were infelicitously phrased. Triple negatives are not conducive to comprehension. The "sufficient to preclude" instruction garnered much attention recently, when another member of this court found, based on juror comprehension studies, that instructions similar to those given in the McHenry case were confusing and violative of the Eighth Amendment. *United States ex rel. Free v. Peters,* 806 F.Supp. 705 (N.D.Ill.1992), *vacated,* 1993 WL 130236 (N.D.Ill., April 15, 1993).[50] Whatever this court may think of the clarity, or lack thereof, of the Illinois death sentencing instructions, the Seventh Circuit has made it plain beyond cavil that the instructions are constitutionally sound and that district courts have no authority to conclude otherwise. *Gacy v. Welborn,* 994 F.2d 305 (7th Cir.1993), *reh'g denied,* (May 7, 1993); *see Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); *Williams v. Chrans,* 945 F.2d 926 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). Albanese cannot obtain relief on the basis of Claim 15.

*B. Life Imprisonment without Parole.*

Albanese challenges another aspect of the sentencing jury instructions in Claim 16:

> The trial court erred in instructing the jury which was to determine the death penalty issue in the McHenry County case, in that it failed to instruct the jury that the alternative to the death penalty was life imprisonment with no possibility of parole.

On direct appeal, the Illinois Supreme Court determined that there was no error in failing to inform the jury that life imprisonment was the only alternative to the death penalty because "the jury was only responsible for choosing whether the death penalty was applicable, not the severity of a prison sentence should the death penalty be found to be appropriate." *Albanese I,* 79 Ill.Dec. at 621–22, 464 N.E.2d at 219–20.

Under the Illinois Unified Code of Corrections, a defendant who has been convicted of more than one murder must suffer one of two penalties: death or life imprisonment without possibility of parole. Ill.Rev.Stat. ch. 38, ¶ 1005–8–1(a)(1)(c). The jury in the McHenry County case, which convicted Albanese of two murders, was instructed in relevant part as follows:

> It is the law of this state that every person found guilty of murder shall be put to death or imprisonment. Only you can determine that the death penalty shall be imposed by the Court. If you do not do so, the Court will sentence the defendant to a term of imprisonment.
>
> Mitigating factors may include that . . . the defendant may be rehabilitated or restored to useful citizenship.
>
> If after your deliberations, you are not unanimous in concluding that there is no mitigating factor or factors sufficient to preclude the imposition of the death penalty, sign the verdict form that says no agreement on death penalty. . . . If you sign these forms, the Court must sentence the defendant to imprisonment.

(McHenry R. vol. XXXVI at 242, 247–48). These instructions are essentially identical to Illinois Pattern Jury Instructions 7A.01 and 7A.04 in effect in 1982.

Two arguments have been advanced in support of Claim 16. Albanese himself essentially argues that the instruction incorrectly summarized state law. A more complex argument is urged by *amicus curiae,* the Capital Resource Center, McArthur Justice Center, Alton Coleman, Andrew Kokoraleis, Jerry Mahaffey.[51] *Amicus curiae* contend that the Illinois Supreme Court's failure

---

50. Subsequent to the decision in *Free,* this court requested additional briefs from the parties on the impact of the *Free* juror comprehension studies on the instruction given in this case. In light of the Seventh Circuit's opinion in *Gacy v. Welborn,* the court does not address the issue.

51. Like Albanese, these three individuals have been sentenced to death after being convicted of more than one murder. The juries which sentenced these inmates were instructed that the alternative to the death penalty was a term of imprisonment; life imprisonment without parole was not mentioned.

to apply its decision in *People v. Gacho,* 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 (1988), *cert. denied,* 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988) retroactively to Albanese, and to those similarly situated, violates the Eighth and Fourteenth Amendments. The court addresses these arguments in sequence after summarizing the *Gacho* decision.

### 1. *People v. Gacho.*

The defendant in *Gacho* was convicted of two murders. On direct appeal, the Illinois Supreme Court affirmed his convictions, but found that the defendant had been deprived of a fair sentencing hearing due to the prosecutor's improper argument that defendant might be released on parole from a term of imprisonment. 122 Ill.2d at 256–57, 119 Ill. Dec. 287, 522 N.E.2d 1146. The prosecutor's comments included the following: "Well, you know that Richard Speck was originally sentenced to death, and he comes up for parole every two years, and one day he is going to get out on parole" and "I ask you to consider the opportunity that this man will someday have to hurt somebody else ... consider that some day he may have that opportunity again." *Id.* at 256, 119 Ill.Dec. 287, 522 N.E.2d 1146. The Court noted that comments regarding the defendant's possible future crimes are even more inflammatory than remarks about the possibility of parole. *Id.* at 259, 119 Ill.Dec. 287, 522 N.E.2d 1146.[52]

Having held that the prosecutor's comments required a new sentencing hearing, the Court went on to "address ... issues which might reappear at the new hearing." *Id.* at 260, 119 Ill.Dec. 287, 522 N.E.2d 1146. The defendant argued, as Albanese had on appeal, that the jury should have been informed that the only alternative to the death penalty for a convicted multiple murderer is life imprisonment without parole or release except through executive clemency. In a break from its past holdings, the Court accepted this argument. *Id.* at 260–63, 119 Ill.Dec. 287, 522 N.E.2d 1146.

The standard IPI instruction given here, which states that if a sentence of death is not imposed, the judge will sentence the defendant to imprisonment, is not a complete instruction as to the statute in regard to a multiple murderer. A convicted defendant cannot be given imprisonment for a term of years, but is required by statute to be sentenced to natural life imprisonment.... [The instruction given] could have persuaded [the jury] that the death penalty was the only certain way to protect society from this defendant.

*Id.* at 261–62, 119 Ill.Dec. 287, 522 N.E.2d 1146. The Court acknowledged that it had previously approved the use of instructions not including a life without parole provision in multiple murder cases, citing *Albanese I* and *People v. Stewart,* 105 Ill.2d 22, 85 Ill. Dec. 241, 473 N.E.2d 840 (1984), *cert. denied,* 471 U.S. 1131, 105 S.Ct. 2666, 86 L.Ed.2d 283 (1985), and directed that its decision be applied prospectively only:

Our decision on this issue differs from what this court said in *Albanese* and *Stewart.* Under the supervisory authority inherent in this court, as well as that conferred by section 16 of article VI of the Illinois Constitution of 1970, we direct that after the date of this opinion, the trial courts of this State, when conducting a sentencing hearing involving a defendant convicted of multiple murders, use the [life imprisonment] jury instruction.

*Gacho,* 122 Ill.2d at 262–63, 119 Ill.Dec. 287, 522 N.E.2d 1146.

In the years since *Gacho,* several litigants have argued that *Gacho* announced a new rule of constitutional criminal procedure which must be applied retroactively to cases which were on direct appeal at the time of the decision. The Illinois Court has consistently refused to apply *Gacho* retroactively, holding that it did *not* announce a constitutional principle, but was based exclusively on state law. In its most recent case on the issue, the Court stated:

of a life without parole instruction did not necessitate the remand. *Gacho,* 122 Ill.2d at 259–60, 119 Ill.Dec. 287, 522 N.E.2d 1146.

---

**52.** These facts are related here in some detail because the improper comments of the prosecutor were the reason the *Gacho* court determined that a new sentencing was warranted; the lack

Defendant argues that in light of *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L.Ed.2d 649, 107 S.Ct. 708, the new rule announced in *Gacho* must be applied retroactively. According to *Griffith*, decisions announcing new constitutional rules of criminal procedure are "to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." (479 U.S. at 328, 93 L.Ed.2d at 661, 107 S.Ct. at 716.) The court has answered defendant's argument in other cases, and has held that the *Gacho* rule was decided as a proper rule of statutory interpretation, and did not constitute a new constitutional right. (See, *e.g., People v. Franklin* (1990), 135 Ill.2d 78, 114 [142 Ill.Dec. 152, 552 N.E.2d 743]; *People v. Kokoraleis* (1989), 132 Ill.2d 235, 288 [138 Ill.Dec. 233, 547 N.E.2d 202]; *People v. Coleman* (1989), 129 Ill.2d 321, 348–49 [135 Ill.Dec. 834, 544 N.E.2d 330]; *People v. Spreitzer* (1988), 123 Ill.2d 1, 43–44 [121 Ill.Dec. 224, 525 N.E.2d 30].) We reaffirm the view that the *Gacho* rule is prospective only. *People v. Steidl*, 142 Ill.2d 204, 245, 154 Ill.Dec. 616, 568 N.E.2d 837, *cert. denied,* —— U.S. ——, 112 S.Ct. 161, 116 L.Ed.2d 125 (1991).

### 2. *Constitutionality of McHenry Instruction.*

■ Albanese argues in Claim 16 that the jury instruction given in the McHenry case was "not a full and accurate statement of law concerning the sentence to be imposed." (Petitioner's Resp. to Mot. to Deny Pet. at 21). Albanese is certainly correct that the instruction was not a complete statement of the death penalty statute's provisions; additionally, the court believes that the instructions given were misleading. Because this error was one of state law, however, it cannot be remedied by a federal court. *Lewis v.*

*Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Pulley v. Harris,* 465 U.S. at 41, 104 S.Ct. at 874; *Taylor v. Gilmore,* 954 F.2d 441, 448 (7th Cir.), *cert. granted,* —— U.S. ——, 113 S.Ct. 52, 121 L.Ed.2d 22 (1992).

More generally, Albanese contends that "[j]ustice dictates that [Albanese] had to be sentenced by a jury which knew full impact of the decision that it was to make." The only citation provided is to *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), which held unconstitutional a trial judge's use of a confidential presentencing report in imposing the death penalty. *Gardner* notes the seriousness of capital punishment and states that it must not be permitted to be imposed based on "caprice or emotion," but it holds no lesson for the propriety of the jury instructions at issue here.

■ Neither Albanese nor *amicus* has pointed to, and the court has not discovered, any federal case holding that, as a matter of constitutional law, a capital sentencing jury must be instructed as to all of the sentencing options a given death penalty statute provides.[53] Instead, once a state has complied with minimum constitutional procedural safeguards[54], it is given wide latitude to determine which factors a jury may consider in deciding whether to impose a death sentence. *California v. Ramos,* 463 U.S. 992, 999–1001, 103 S.Ct. 3446, 3452–53, 77 L.Ed.2d 1171 (1983).

While *Ramos* did not address the precise issue raised here, it is instructive. The Court in *Ramos* considered whether the giving of the so-called "Briggs Instruction" in a capital sentencing hearing violated the constitution. The Briggs Instruction informed the jury that a sentence of life imprisonment

---

53. *See, e.g.,* Note, Julian H. Wright, Jr., *Life–Without–Parole: An Alternative to Death or Not Much of a Life at All?,* 43 Vand.L.Rev. 529, 537 n. 47 (1990) (stating that the law is unsettled regarding how much information death qualified jurors should receive about parole).

54. A capital sentencing scheme must satisfy "two competing commandments of the Eighth Amendment.... States must limit and channel the

discretion of judges and juries to ensure that death sentences are not meted out 'wantonly' or 'freakishly.' ... [and] States must confer on the sentencer sufficient discretion to take account of the 'character and record of the individual offender and the circumstances of the particular offense' to ensure that 'death is the appropriate punishment in a specific case.' " *Graham v. Collins,* —— U.S. ——, ——, 113 S.Ct. 892, 898, 122 L.Ed.2d 260 (1993) (citations omitted).

without parole may be commuted by the governor to a sentence that includes the possibility of parole. *Id.* at 995–96, 103 S.Ct. at 3450. The jury in *Ramos* was not told that the governor could similarly commute a sentence of death to a lesser punishment. The California Supreme Court reversed the death sentence, in part because this combination of instructions allowed the jury to believe mistakenly that the "only way to keep the defendant off the streets is to condemn him to death." *Id.* at 996, 103 S.Ct. at 3451. The instructions given in *Gacho* and in Albanese's case could also produce this misapprehension in jurors: telling the jury that the alternative to death is imprisonment might lead it to believe that public safety would be assured only through the imposition of the death penalty. *Gacho,* 122 Ill.2d at 261, 119 Ill. Dec. 287, 522 N.E.2d 1146.[55] Despite this concern, the Supreme Court upheld the constitutionality of the Briggs Instruction in *Ramos,* finding that it did not preclude individualized sentencing determination or introduce a speculative element in jury deliberation. 463 U.S. at 1013, 103 S.Ct. at 3459. Moreover, the Court found no constitutional infirmity in the California scheme which informed the jury that a life sentence could be commuted but not that a death sentence also could be commuted. *Id.* In light of *Ramos,* Albanese's appeal to the general principle that imposition of capital punishment must be based on reason, rather than emotion and caprice, is an insufficient basis on which to grant relief. All constitutional rules can be stated in very general terms, but general principles do not compel specific rules. *See Taylor v. Gilmore,* 954 F.2d at 446–47 (general principle that capital sentencing must be reliable does not compel rule that sentences imposed by juries which have been led to believe that ultimate responsibility for sentencing rests elsewhere are unconstitutional).

*3. Retroactivity.*

*Amicus curiae* submits a more complex argument. The statutory provision, Ill.Rev. Stat. ch. 38, ¶ 1005–8–1(a)(1)(c), requiring that a multiple murderer be sentenced either to death or life imprisonment was enacted in 1980. Between 1980 and 1988, the date of the *Gacho* decision, twelve multiple murderers were sentenced to death by juries which had been given the Illinois Pattern Instruction providing that the alternative to death was "imprisonment." (*Amicus* Br. at 2). Albanese was one of these offenders, Robert Gacho was another. As has been set forth above, the Illinois Supreme Court in *Gacho* found the Pattern Instructions misleading in cases of multiple murder, but ordered that new instructions would be required only in sentencing hearings held *after* the date of the *Gacho* opinion. These new instructions would inform the jury that the alternative to death is life imprisonment without parole, except through executive clemency. *Gacho,* 122 Ill.2d at 261–63, 119 Ill.Dec. 287, 522 N.E.2d 1146. The result of the decision, and the subsequent rulings that *Gacho* would not be applied retroactively, was that Robert Gacho received the benefit of the new instructions at his resentencing hearing, but that the other eleven defendants sentenced under the Pattern Instructions would not receive that benefit. *Amicus* argues, with some force, that this disparity in treatment between similarly situated individuals results in the arbitrary and capricious imposition of the death penalty in violation of the Eighth and Fourteenth Amendments.[56] (*Amicus* Br. at 6).

 While this court cannot consider alleged errors of state law on habeas review, it can address claims that a state law is being *applied* in an unconstitutional manner. *Coogan v. McCaughtry,* 958 F.2d 793, 802 (7th

---

**55.** *Gacho* relied on a Fifth Circuit case in making this point, *King v. Lynaugh,* 828 F.2d 257 (5th Cir.1987). *King* was subsequently vacated, 850 F.2d 1055 (5th Cir.1988) (*en banc*) (rejecting defendant's argument that he was constitutionally entitled to voir dire the jury on Texas parole law, such that the prospective jurors would be made aware that a capital murder defendant must serve a minimum prison term of 20 years before becoming eligible for parole), *cert. denied,*

488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989).

**56.** The court notes that not all of the eleven multiple murderers identified by *amicus curiae* are similarly situated. The convictions of nine of the 11 were not final at the time of the *Gacho* decision, while the convictions of Albanese and Raymond Stewart were.

Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 495, 121 L.Ed.2d 433 (1992). At the threshold of any such inquiry, however, an obstacle lurks: *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and its progeny. The court must ask at the outset whether, if the habeas petitioner were granted the relief he or she seeks, a "new rule" of constitutional law be created. *Graham v. Collins,* —— U.S. ——, ——, 113 S.Ct 892, 897, 122 L.Ed.2d 260 (1993) (citing *Penry v. Lynaugh,* 492 U.S. 302, 313, 109 S.Ct. 2934, 2943, 106 L.Ed.2d 256 (1988) and *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070 (plurality opinion)). A "new rule" cannot be announced or applied on collateral review, unless it falls into one of two exceptions. *Graham,* —— U.S. at ——, 113 S.Ct. at 897. A rule is "new" if it was not *"dictated* by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original).

■ If this court were to grant Albanese's Petition for Habeas Corpus due to the trial court's failure to instruct the jury on life imprisonment without parole, that ruling could be based on one of two possible constitutional grounds: (1) that Albanese had an Eighth Amendment right to be sentenced by a jury aware that the alternative to death was life without parole (i.e. that the *Gacho* rule is of constitutional dimensions); or (2) that the Illinois Supreme Court's refusal to apply *Gacho* retroactively is arbitrary and capricious in violation of the Eighth and Fourteenth Amendments. The court concludes that each of these holdings would constitute a "new rule" under *Teague.*

The discussion of *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), *supra* at 565–566 illustrates that federal precedent certainly did not dictate that juries be instructed about life imprisonment without parole. In other words, the rule announced in *Gacho* was not demanded by earlier federal cases. *Ramos* was decided in 1983; Albanese's McHenry County conviction and death sentence did not become final until 1984. A reasonable jurist hearing Albanese's claim in 1984 would not have "felt compelled by existing precedent" to grant him relief, therefore relief cannot be granted on collateral review. *Graham,* —— U.S. at ——, 113 S.Ct. at 898 (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990)).

The Illinois Court's refusal to apply the *Gacho* rule retroactively is premised on the statutory nature of the rule. *Steidl,* 142 Ill.2d at 245, 568 N.E.2d 837.[57] In order to grant relief to Albanese based on the disparity in treatment received by Robert Gacho and the eleven other multiple murderers identified by *amicus curiae,* this court would have to find unconstitutional the Illinois Court's authority to announce rules prospectively.[58] Having discovered no federal authority for that proposition, the court concludes that it would have to announce a "new rule" in order to invalidate the Illinois Court's prospective application of the *Gacho* rule. Indeed, such a rule would conflict with established notions of federal-state comity.

A constitutional rule that is "new" may nonetheless be applied on collateral review if it falls into either of the exceptions identified in *Teague.* The first exception applies if a rule "places a class of private conduct beyond the power of the State to proscribe," or

---

57. The court accepts this characterization of the basis for the *Gacho* rule for two reasons: (1) the court has independently determined that *Gacho* was not of constitutional dimensions; and (2) if *Gacho* were a constitutional case, Albanese would be left without a remedy. After all, if *Gacho* announced a new *constitutional* rule, *Teague* and its predecessor *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 would dictate that the new rule be applied only to cases which were not final on the date it was issued. Albanese's case became final four years prior to *Gacho.*

58. Under Illinois law, judicial decisions are generally given retroactive effect, but it is within the inherent power of the state Supreme Court to decide that a decision will not be retroactively applied. *Deichmueller Constr. Co. v. Industrial Comm'n,* 151 Ill.2d 413, 415, 177 Ill.Dec. 446, 603 N.E.2d 516 (1992). The general rule of retroactivity does not apply if the court "expressly declares that its decision is a clear break with the past, such as when it explicitly overrules its own past precedent, disapproves a practice that it has previously approved, or overturns a well-established body of lower court authority." *People v. Martin,* 240 Ill.App.3d 260, 265, 180 Ill. Dec. 188, 606 N.E.2d 1265 (1992).

"prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *Saffle*, 494 U.S. at 494, 110 S.Ct. at 1263 (citations omitted). This exception plainly does not apply to either of the "new rules" which would provide Albanese with the relief he seeks. The second exception allows retroactive application of a "new rule" which announces a "watershed" rule of criminal procedure. *Teague*, 489 U.S. at 311, 109 S.Ct. at 1075. The various formulations the Supreme Court has given this second exception illustrate that in order for the second exception to apply, the "new rule" must be truly profound. The exception is reserved for rules "implicit in the concept of ordered liberty," and "bedrock procedural element[s]." *Id.* at 314–315, 109 S.Ct. at 1077. The Court cautioned that "such rules are 'best illustrated by recalling the classic grounds for the issuance of a writ of habeas corpus—that the proceeding was dominated by mob violence; that the prosecutor knowingly made use of perjured testimony; or that the conviction was based on a confession extorted from the defendant by brutal methods." *Teague*, 489 U.S. at 313–14, 109 S.Ct. at 1077 (quoting *Rose v. Lundy*, 455 U.S. 509, 544, 102 S.Ct. 1198, 1216–17, 71 L.Ed.2d 379 (1982) (Stevens, J. dissenting) (footnotes omitted); *Graham*, —— U.S. at ——, 113 S.Ct. at 903.

That "watershed" rules are scarce is confirmed in reviewing recent decisions applying the analysis outlined in *Teague*. None of the following constitutional rules qualifies for retroactive application under the second *Teague* exception: (1) the prohibition on prosecutorial argument that diminishes a jury's sense of responsibility for the sentencing decision, *Sawyer v. Smith*, 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990); (2) the rule against racially motivated peremptory jury challenges established in *Batson v. Kentucky, Williams v. Chrans*, 945 F.2d 926 (7th Cir.1991); (3) the entitlement to a lesser included offense jury instruction, *Andrews v. Deland*, 943 F.2d 1162 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); and (4) the prohibition on police initiated interrogation after a defendant has asserted his or her right to counsel at an arraignment hearing, *Collins v. Zant*,

892 F.2d 1502 (11th Cir.), *cert. denied*, .498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990). Neither of the "new rules" which would afford Albanese relief from his McHenry County death sentence is of any greater magnitude than those listed above. Accordingly, the second *Teague* exception is inapplicable and relief based on Claim 14 is denied.

No constitutional infirmity having been found in the McHenry County sentence after examination of Albanese's claims, the court does not disturb it.

Before concluding, the court wishes to note that its task in resolving this matter was made more arduous than necessary by the inclusion in the Petition of claims too tenuous to withstand consideration. These claims were examined by the court, and their rejection explained in some detail, because of the seriousness of the penalties at stake. While the court appreciates the duty of zealous representation, the inclusion of insubstantial claims results in waste of judicial resources.

## CONCLUSION

For the foregoing reasons, the Petition and Supplemental Petition for Writ of Habeas Corpus of Charles Albanese are denied.

## *APPENDIX*

Claims of Constitutional Error Contained in Charles Albanese's Petition and Supplemental Petition for Habeas Corpus

**Conviction Claims**

Petitioner's conviction was obtained and remains in effect in violation of rights guaranteed to him under the Sixth and Fourteenth Amendments to the Constitution of the United States, in one or more of the following ways:

1. Petitioner's trial counsel failed to provide reasonable effective assistance of counsel, and his deficient performance prejudiced the Petitioner and deprived him of a fair trial, under the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in that said attorney:

a. Failed to consult with any attorneys experiencing [sic] capital litigation.

b. Failed to obtain and consult with an expert in chemistry or toxicology, who could have refuted or discredited the expert testimony of the State's expert witnesses.

c. Failed to adequately educate himself in the field of toxicology, specifically with respect to arsenic poisoning and the methodology employed in investigating the same.

d. Failed to obtain an expert witness in the field of accounting in time to adequately examine the State's case with respect to Petitioner's financial status.

e. Failed to adequately provide the accountant that was employed with sufficient documentation to thoroughly analyze Petitioner's financial status, and give an unqualified opinion of same.

f. Failed to interview the State's expert witnesses in advance of trial.

g. Failed to investigate leads provided to him by Dr. Conibear in investigating the problems with the Department of Public Health Toxicology Laboratory, although such information came to his attention.

h. Failed to rebut evidence of the testing done by the Northern Illinois State Crime lab which indicated the presence of arsenic and several items relevant to Petitioner's case, although he was aware that the qualitative nature of that testing, as opposed to quantitative testing, was invalid for the purposes for which the testing was done.

i. Failed to consult with any expert as to the reliability of the testing procedures employed by the State's expert witnesses.

j. Failed to object to hearsay testimony of Donald Fishbein.

k. Failed to request individual voir dire of potential jurors and separation of individual, potential jurors, during the voir dire process.

l. Failed to file any pretrial motions to declare the Illinois Death Penalty Statute unconstitutional because of the un-

bridled discretion it places in the prosecutors.

m. Failed to request a continuance when he was advised of the State's intent to seek the death penalty.

n. Failed to seek a continuance, even though he became involved approximately, only one month prior to commencement of trial in a capital case, and he had no previous capital experience.

2. The trial court erred in allowing death penalty qualification of the jury that was to decide the guilt phase of the trial.

3. The trial court erred in allowing Rudolph Schaefer to give an opinion as to the financial condition of Petitioner, as opposed to merely allowing him to summarize the financial evidence that had been presented.

4. Petitioner was not proved guilty beyond a reasonable doubt.

5. The scientific evidence used against the Petitioner was patently unreliable and inadmissible.

6. The state of Illinois knew or should have known of the gross inadequacy of the Toxicology Laboratory of the Illinois Department of Public Health, and violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not providing this information to Petitioner.

Petitioner's convictions were obtained based on perjury or other patently false evidence including, but not limited to:

7. Testimony of Fred Townsend, State's Chemist who performed tests which were indispensable foundation for opinions as to cause of death, that he performed tests on body tissue samples of Marion Mueller that he received on May 29, 1981. Evidence now available to Defendant reveals Marion Mueller's body tissue samples were not available until August, 1981. All of this evidence was within the knowledge and control of the State.

8. Testimony of Fred Townsend that he only performed two sets of tests on tissue samples of M.J. Albanese, on in May 1981 and one in September, 1981. Documents now available to Defendant re-

veal Townsend performed a third series of tests in June, yielding results that directly contradict the results of the May and September tests. Said contradictions raise a reasonable doubt as to the cause of death of M.J. Albanese. All of said documents were within the control of the State.

9. Financial exhibits prepared by the State or at the direction and control of the State, intentionally omitted substantial amount of income (1989—$21,263.13, 1981—$46,800.00) and misreported expenses (1980—$23,063.09, 1981—$5,797.93) to create a grossly distorted ($96,924.15 net distortion) picture of Charles Albanese's true financial health. The 1980 misreported expenses break down as follows:

—$10,590.00 transferred from one checking account to another and shown as an expense each time;

—$1,700.00 drawn in cash from account and deposited in another, and shown as an expense each time;

—$10,773.09 used to pay funeral expenses of Marion Mueller. (This was not an expense of Charles Albanese that would create a motive for murder, but was handled as such by the State's witness. It is rather an expense paid by Charles Albanese (or his wife) which was created by the death of which he was accused.

10. Michael Albanese, Jr. testified that on September 8, 1980, November 14, 1980, January 6, 1981, February 4, 1981 and February 27, 1981 he was hospitalized with vomiting and other symptoms consistent with, arsenic poisoning (McH R Vol. XIV, p. 24, 25, 30, 31–36, 38, 29). The State argued that this was part of Charles' scheme to get control of the family business. The State had in its control hospital records that showed Michael's hospital admissions were for reasons completely unrelated to arsenic poisoning and that directly contradict his claims of vomiting.

11. The State called Joseph Reichel to testify that he provided Charles Albanese with a quantity of arsenic in "late 1979."

(McH R Vol. XVIII, p. 325, Lake R., p. 1363). The State had police reports and a taped interview of Joseph Reichel in its possession which revealed that he gave the arsenic to Charles Albanese in May or June of 1980. This information corroborates Petitioner's explanation that he wanted the arsenic to eliminate a rodent or pest problem in his neighborhood. (Neighbors of Charles Albanese did testify to the magnitude of the pest problem in their neighborhood in the late Spring of 1980).

The scientific evidence presented to convict Charles Albanese was otherwise unreliable in one or more of the following ways:

12. Townsend testified to results of test performed on the tissue samples of Marion Mueller that he received in May 1981. He also testified to a second series of tests performed on the second set of tissue samples, which yielded identical results as the first. The whereabouts of this second set of tissue samples is unaccounted for for a 15 day period, according to the testimony as to its chain of custody. Additionally, it appears that the second set of tissue samples arrived in two separate shipments, 15 days apart. One package arrived under the coroner's seal and identified as such. Fifteen days later a second package arrived at the Toxicology Laboratory without the coroner's seal or any other marking to account for its chain of custody. No explanation was ever offered as to how and why the tissue samples became separated. Evidence handled in such a fashion is patently unreliable.

## Sentence Claims

Petitioner's death sentence was obtained, imposed, and remains if effect against him in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United State, in one or more of the following ways:

13. The Illinois Death Penalty Statute, Ch. 38 Sec. 9–1 et seq., is unconstitutional, in one or more of the following ways:

a. It permits unlimited prosecutorial discretion in seeking the death penalty, violating the doctrine of separation of pow-

ers, and a defendant's right to due process of law, resulting in death penalty sentences that are arbitrary and capricious and are imposed in a wanton and freakish manner.

b. It fails to provide proper constitutional focus on the individual characteristics of a defendant in having a jury decide the death penalty issue.

c. It defines as a mitigating factor whether or not a defendant has "no significant history of prior criminal activity," which terms are unconstitutionally vague, indefinite and uncertain.

d. It provides that a jury to impose the death penalty must determine that "no mitigating factors exist sufficient to preclude the opposition [sic] of the death sentence," which such standard is unconstitutionally vague, indefinite, and uncertain.

e. It fails to provide proper constitutional standards for the Appellate review for imposition of the death penalty so that death sentences are allowed to remain in effect in a wanton and freakish manner.

f. A majority of the Illinois Supreme Court believed the Illinois Death Penalty Act to be unconstitutional, but have set a judicial doctrine of *stare decisis* above their constitutional judgments.